# CASES

# SUPREME COURT OF JUDICATURE

# STATE OF NEW YORK,

---

## J. AND T. WALDEN *against* J. AND R. LE ROY.

If a vessel be, from sea damage, obliged to bear away to a port of necessity in order to refit, the wages and provisions, from the moment of bearing away to the period of sailing on her original voyage, constitute a subject of general average, the proportion of which may be recovered in an action of *assumpsit*, by the owners of the ship, against the proprietors of the cargo, and of course for which the underwriters on the cargo are liable. *Barker* v. *Phœnix Ins. Co.*, 8 Johns. Rep. 307.

ASSUMPSIT by the plaintiffs, owners of the ship Thomas, against the defendants, proprietors of her cargo, for their quota of a general average, for wages and provisions, incurred and expended, from the time of bearing away to Norfolk, in consequence of a leak sprung in a violent gale of wind, which, on consultation with the crew, rendered it necessary to make for the nearest port, in order to refit.

The demand extended from the moment of bearing away to the period of sailing in prosecution of the original voyage, including the time of detention in unloading, repairing, and loading again. The case was submitted without argument,

the only question being whether, under such circumstances, wages and provisions were subjects of general average?

KENT, Ch. J. delivered the opinion of the court.  In the case of *Leavenworth* v. *Delafield and Dale,* (vol. 1, 573,) decided in this court in February, 1804, the vessel was captured and carried into port, where she was detained four months, and then liberated.  It was there held that the wages and provisions of the crew during the detention, were to be brought into a general average.  In this [*264]    *case the vessel was forced into port by injuries received at sea, which rendered it necessary for the general safety to go into the nearest port to repair.  The two cases appear, at first view, to be sufficiently analogous to admit the application of the same rule, but there is no direct determination on the point in the English law. As far, however, as the question has been incidentally noticed, the opinion seems to have been in favor of the plaintiff's claim, in this case, to general average for the wages and provisions of the crew during the detention at Norfolk.   There were some *nisi prius* decisions before Lord Mansfield, which may be considered as having a remote bearing on this question.   In the case of *Fletcher and others* v. *Poole,* tried at the sittings in 1769, the vessel was forced into Minorca to repair, and, in an action against the insurer on the ship for wages and provisions expended while she was detained to refit, his lordship held that they were never to be allowed against the insurer, as a charge against the ship.    Park, 53.    But afterwards, in the case of *Lateward* v. *Curling,* in which the same question arose, Lord Mansfield admitted there were exceptions to the rule ; as, when it appeared that the expense was absolutely necessary, and occasioned by some of the perils mentioned in the policy.   Park, 125 ;  Marshall, 464.   This last case has been considered by the two authors last cited, and also by Buller J. in *Da Costa* v. *Newnham,* as containing an approbation, by Lord Mansfield, of the rule, that if a vessel went into

port to repair from necessity, those expenses would become general average. I do not think, however, that much if any reliance ought to be placed on *nisi prius* opinions, so destitute of explicitness on this point, and in which the question, as to general average, does not appear to have been mentioned; and the same remark will apply to what fell from Buller, J. in *Robertson* v. *Ewer*, 1 D. & E. 132. The case of *Da Costa* v. *Newnham*, 2 D. & E. 407, is, however, material and important on this subject. In that the decision of the court of K. B. approaches very near to a sanction of the above expenses as a general average. It was held, where a ship is obliged to go into port for the benefit of the whole concern, the charges of loading and unloading the cargo, and taking care of it, and the wages and provisions of the workmen hired for the repairs, become general average. It was not requisite in that case to decide whether the seamen's wages and provisions should become general average, as the crew had been discharged; but the two cases are very analogous in principle, and *have been so regarded by Park and Marshall.     [*265] I cannot perceive any sound distinction between them. But Abbott, p. 282, 283, states the question now under consideration as one upon which a reasonable doubt may be entertained, and on which our law books furnish no decision. He seems rather to intimate his own opinion to be against the allowance of the wages and provisions of the crew, although he admits, in p. 280, the expense of unloading and shipping should be sustained by general contribution. He submits the following distinction for consideration; that if the damage to be repaired be in itself an object of contribution, the incidental expenses ought to be so, otherwise not. The opinion of this author is very respectable, as he is one of the most learned and accurate of the English writers on commercial law. But it is to be observed he states the question as doubtful, and gives no decided opinion, and his distinction is liable to this objection, that it is repugnant to the rule he had already laid down,

that if it be necessary to unlade the goods in order to re-
pair the vessel, the expense of that unlading, warehousing,
&c. go into a general average. Those expenses are cer-
tainly as collateral or incidental to the repairs, as the pro-
visions of the crew during that detention, and the wages
of the workmen employed are still more closely incidental
to the repairs, and yet we see that they are allowed, while
the repairs are not.

The question, upon the whole, may be considered as still
open in the English law, but with a pretty evident inclina-
tion in the courts, and in most of the writers, to apply the
rule of contribution to the present case. The Law Merchant
is, however, the general law of commercial nations; and,
where our own positive institutions and decisions are silent,
it is to be expounded by having recourse to the usages of
other nations. This has been the maxim from the time of
the Rhodian law to this day.

Ricard, the Amsterdam merchant, says, that if a ship
is forced by tempests to go into port to repair, and cannot
continue the voyage without hazard to all concerned, the
wages and provisions of the crew, from the day it was de-
termined to seek the port, to the day of the vessel's depar-
ture again on the voyage, are to be brought into gross ave-
rage. Beawes has adopted this passage from Ricard; for
he lays down the rule in the same words, vol. 1, 161, and
it is to be observed that Beawes is frequently regarded and
cited, in our books, as an authority in the English
[*266]   law. Emerigon, also, vol. 1, 625, says, *that there
is the same rule in the maritime jurisprudence of
France; and it appears from the case of *Newman* v. *Cazalet*,
cited in Park, 424, to be the established rule in the com-
mercial court at Pisa. As far, then, as the foreign writers
and decisions are to influence, the rule may be considered
as established in favor of the plaintiffs' claim. The case
reported in the text of the civil law, Dig. 14, 2, 6, and upon
which some of the foreign civilians have established their
doctrine, was merely whether the expenses of the repairs

themselves should be made a general average, *nautœ pro damno conferre debeant*, and it was decided they ought not. The present dicision will not, therefore, interfere with this case in the civil law. Independent of these foreign authorities, I cannot distinguish this case in principle from that of *Leavenworth* v. *Delafield and Dale*. It is equally necessary, in both cases, that the mariners should remain for the purpose of proceeding to the port of discharge, as soon as the inevitable misfortune, the *casus fortuitus*, creating the delay is removed. The cargo might be sacrificed at the intermediate port, if the crew were not to be detained, and the expenses of their detention, being for the common benefit, ought to be apportioned as a common burden. On the analogy, then, between this case and those decided in this court, and in England; on the ground of the foreign decisions, in a case appertaining to the commercial law of nations; and on the reason of the case, as coming within the spirit of the rule for contributions, we are of opinion for the plaintiffs.

LIVINGSTON, J. This cause is submitted, without argument, on a supposition that it is governed by that of *Leavenworth* v. *Delafield*, 1 Caines' Rep. 573, decided in this court in February term, 1804. The two cases, however, differ greatly.

We have as yet only said, that, on a detention *after capture*, about which there is no diversity of sentiment among foreign writers, moneys expended for provisions and wages, while the vessel and cargo *are reclaiming*, shall be borne ratably by all the parties whose property is in jeopardy. For this we assigned as a reason, that capture being a misfortune, happening not to the *ship alone*, but also to the cargo and freight, and *that* without any defect attributable to the vessel, or fault in her owners, it was reasonable all parties should contribute to the costs and charges incident to averting a condemnation, among which those for wages and provisions were indispensable. It may also be doubted

whether in such an event the captain be bound to [*267]  keep the mariners, and whether it be *not matter of contract among the underwriters on these several subjects, that expenses of this kind, which are incurred for *the recovery*, and not for repairing of the property, shall form a gross average. But neither of these reasons can apply here. The disaster which compelled the Thomas to bear away for Norfolk, befel the ship alone. She sprung a leak, to repair which, so as to pursue her original voyage, and thus earn freight, she went into the nearest port. It is true, it was for the defendants' benefit that this course was adopted in preference to letting the vessel sink. But this argument, if care be not taken, will prove too much.

If masts or a rudder be caraied away in a storm, or by lightning, it will be for the benefit of all parties concerned that they be replaced ; but it was never yet contended that the owner of goods was to bear any part of such expense. So if a vessel touch at a port in her voyage, and *there* be struck with lighting, it is as much for the shipper's benefit that she be repaired, as if the misfortune had happened at sea, and yet, will it be said, that in such cases, too, these charges shall be ratably paid ? To prevent this argument, drawn from the benefit which shippers receive, from misleading us, its application should be confined to advantages conferred which do not result from a previous obligation on the party from whom they proceed. If they be the effect of contract, or of an antecedent stipulated reward, as we shall presently see was the' case here, it is idle to expect any other renumeration than that which the terms thereof prescribe. In the given case, the freight agreed on is all the compensation the plaintiffs were to receive, and in settling a suitable equivalent, they took into the estimate the very risk and expense, a part of which they now claim of the defendants. The detention of a crew after capture, may emphatically, and in the sense above mentioned, be considered as for the *common benefit*, because

a technical total loss having happened, there is no further duty to keep them. They may be .dismissed with prejudice to the insurance, but if these plaintiffs. had discharged the seamen, and thus voluntarily broken up the voyage, neither the defendants, nor the assurers of ship or freight, would have paid them one shilling.

If the maintenance and wages of a crew, under such a disaster, be objects of general contribution, how is this to be reconciled with what is so clearly the contract of every owner of a ship, who takes goods on freight?

Does not every charter *party, as has already [*268] been hinted, contain a covenant that "he will, *at his own cost and charge*, keep his vessel staunch and tight, and furnish her with *mariners, provisions*, &c. during the *whole voyage?*" Does not this engagement oblige him not only to provide a good vessel at the commencement of the voyage, but, if possible, to repair her as often as may be necessary, and to bear *all the expenses* occasioned thereby? Why, then, are these expenses to be separated? If by the charter party the owners of the ship have agreed to pay the whole, what right have they to ask any part of them from the merchant? And if any, why one part more than another? As well might a landlord, who for a certain rent had covenanted to rebuild, after injuries by lightning or other accidents, during the lease, ask of his tenant, on the pretence of having done him a service, to contribute towards so much of the expense as was occasioned by the wages of workmen and their provisions. No person would tamely submit to such an exaction; and yet, in what would his case differ from that of the defendants, who, on precisely analogous terms, were tenants of the ship Thomas?

Again, does not the right to freight, generally speaking, depend on completing the voyage? And how can this be done, in case of many accidents, unless the vessel stop somewhere and repair them? The defendants in this very case might have insisted either that the Thomas should be repaired, or on the plaintiffs' finding another ship; and in

case of refusal to do either, they might have demanded their goods, as they were under no restraint, (as in *Leaven· worth* v. *Delafield*, arising from capture or other cause,) and have sent them on by another opportunity, without having anything to do with the wages or provisions, or other expenses, incident to the repair of every vessel. It is nothing to the shipper of goods, as it respects the charge he is at in the transportation of them, whether the voyage be lengthened by adverse winds, or by the springing of a leak and going into port. In both cases the owner of the vessel is put to greater expense for wages and provisions; but in neither is the price of freight increased, which will become the case indirectly and very often, if any part of this additional burden be to be borne by him.

This claim, to say the least, is novel in our country; nor has it yet been made with success in Great Britain, although instances of this nature must occur every day; never has a shipper been compelled, in that country, [\*269]    to contribute towards \*disbursements of this kind.

The sense and practice of the mercantile world must, therefore, notwithstanding theoretical speculations, be against it, and these, in points otherwise doubtful, are entitled to consideration. In England, I understand through a channel which leaves no doubt of the information being correct, that in a case like the present, these expenses are *never* brought into a general average. A merchant, if a contrary practice be introduced, will never be able to calculate, with any certainty, the amount of his freight, nor will he know how to cover himself by insur- ance. There is no hardship in throwing the whole of these expenses, in ordinary cases, on the owner of the ship, and letting him look to his policy on the vessel for repairs put on her, and to his underwriters on the freight, for any *extra* expenditure for wages and provisions, which, being a deduction from her gains or earnings, ought naturally to be paid by those who have underwritten that subject. It is best, where it can be done, and where it does not inter·

fere with certain well known rules, which have been es-
tablished in the case of jettisons, and some other losses
which are voluntarily incurred, for the sake of all, to let
every subject bear its own loss. Every man will then
know the extent of his liability, and act accordingly. In
cases like the present, no injury can arise in making the
separation, while frauds may be practised under a contrary
rule. On the smallest accident the owner, or master, will
be tempted to go into port, nor will he have any great in-
ducement to shorten his stay there, so long as he be per-
mitted to employ the crew in repairing the injury, (which
they will oftentimes be competent to do,) and to victual
and pay them at the expense of the owner of the cargo,
who has relied on his contract to do all these things himself.

For these reasons I am for confining a general contri-
bution for *extra* wages and provisions, to a case of capture,
or where a vessel goes into port to avoid an enemy, or
where some other step is taken by the master, *without any
previous injury to the vessel alone*, evidently for the benefit
of the whole, and with the view of escaping from an im-
pending peril. All these cases rest on the same principle.
No particular accident having happened to the vessel,
which it is the owner's special duty and interest to repair,
there is no reason why he should personally bear a
heavy loss, which, in most of the cases put, is *voluntarily*
incurred, to prevent a general one, greater still.

Hence, it will result, and, perhaps, a safer *rule    [*270]
cannot be followed than the one suggested by Ab-
bott, which is, that if the injury to be repaired be not *of
itself* an object of gross average, (and certainly the stop-
ping of a leak falls not within this description,) neither
shall any of the incidental or consequential charges be-
come so. If a shipper be not obliged to find materials, or
carpenters, to repair injuries, from tempest, or stranding,
why should he be taxed to pay or victual the crew? Ob-
vious as this difficulty be, no writer has hitherto attempted
its solution. A merchant suffers enough by the detention

of his goods. If they come to a falling market, in conse-
quence of a protraction of the voyage, or if damaged, or
totally ruined by the springing of a leak, he cannot apply
to the owner of vessel or freight for the smallest indemnifi-
cation. He must bear the loss himself, or look to his own
insurance.

But the principle, on which the plaintiffs expect to suc-
ceed, is supposed to be in the case of *Da Costa* v. *Newnham*,
2 D. & E. 407. The crew being discharged at the place of
·repair, the question which now occurs was not directly
agitated, nor was any thing more determined, than that the
underwriters, on a vessel, are liable for " wages and provi-
sions of workmen hired to refit her." This seems a self·
evident proposition; for as these repairs are put on the
subject which they have insured, not only should they pay
for the materials, but for the labor bestowed on them.
To get rid of this responsibility, it was urged that the sail-
ors being employed for this purpose, " they were bound to
woik without a further allowance," and the court, with all
the counsel, admit this would have furnished a valid de-
fence for underwriters on a ship, provided it had been true
in point of fact; but those of the crew, who had been
hired after their discharge, were not regarded as hands be-
longing to the vessel, but as ordinary workmen. The man-
ner in which the court and counsel express themselves
merits attention, and goes a great way in deciding the pre-
sent controversy in favor of the defendants, if a point not
immediately litigated can be regarded as settled by any
thing which judges may say. If these wages had been
paid to the sailors as such, the plaintiffs' counsel allowed
the defendant would have nothing to do with them. " But
the fact," say they, " is otherwise. At the time the repairs
were going on, many of the persons, indeed, who had
served on board the ship were hired, but it was in the ca-
pacity of laborers, and not of sailors." The de·
[*271] fendant's counsel, also, without denying *the lia-
bility of their client, if these men were to be con·

sidered as common workmen, rely altogether on their being seamen, and therefore not entitled to extra pay. Ashurst, Justice, agreed to the law as stated by the defendant's counsel, but not to the fact. "As to the charge for the sailors' work, had they remained as such," says he, "on board, it would be fair that a deduction should be made, but it appears that the crew were discharged immediately on the ship's coming into port, and there is no reason why they should not afterwards be employed as laborers, in making the repairs, as well as any others." Is not this, in plain terms, saying that the wages and provisions of seamen, under a calamity of this kind, cannot fall on the underwriter of a ship. Buller, too, although he refers to a passage in Beawes, for the foreign law, on which he gives no opinion, lays hold of the same distinction, to make the underwriter liable; "for," says he, "the crew had been discharged, "and those men had been employed as common workmen." I have been thus particular in examining this case, because it is by some supposed an authority in favor of the plaintiffs, whereas, according to my understanding, we find recognized in it, without any qualification, the rule on which the defendants here rely, that the wages and provisions of a crew, during a detention to repair, cannot be brought into a general average. In this view it is a very strong case in their favor, and so it has ever appeared to me. But this is not the only British authority of the kind. Lord Mansfield, in the case of *Feltcher and others* v. *Poole*, (Sitt. after Easter, 1769, Park, 52,) declared, that wages and provisions, expended while a ship is refitting, after a storm, could never be allowed against an insurer on the vessel. Much lesss, then, can they be demanded of an owner or underwriter on goods. *Eden* v. *Poole*, Sitt. after Hil. 1785 ; Marsh. 61 ; 1. D. & E. 127. Buller, too, on a trial before him, ruled, that a charge for wages and provisions, during a detention like the present, could not be recovered on a policy on the ship and goods, but that the freight alone was liable for it.

It is also settled in *Robertson* v. *Ewer*, that the expense of wages and provisionns, occasioed by an embargo, which is a stronger case than this, cannot be recovered on a policy on the ship. This case *is* cited, although it be that of an embargo, for the purpose of quoting what *fell from* Mr. Justice Buller, and which applies strongly, and immediately, to the point before us. "If," says he, "the ship had been detained in consequence of an injury re-[*272] ceived in a storm, though * the underwriters must ·have made good the damages, yet the insured could not have claimed the amount of wages or provisions, dur-ing the time spent in repairing. The court," he proceeds, "only look to the subject-matter of the insurance. Here the ship was safe, and the wages and provisions are no part of the thing insured." It will at once be perceived that this reasoning applies with double force against ren-dering an owner of goods, or their underwriters, liable for expenses of this kind.

If there be any foreign author who thinks differently, his dictum will not be found to be supported by the best and more ancient writers on the law of insurance. Vol. 1, 624. Emerigon, after inquiring "whether the expenses. of re-pair and continuing in port to refit, after an accident of this kind, are to make a general average?" informs us, that the Rhodian law decided in the negative, and then cites many celebrated authors, (Faber, Vinmus, Duarenus, Kuricke, Loccenius, Devicq, Roccus and Marquardus,) who approve of, and adopt this decision. The reason they assign is, "that such expenses are incurred for the purpose of enabling the vessel to pursue her voyage, rather than with a view of preserving the merchandise."

The same principle, says this profound lawyer, seems to have dictated the eleventh article, respecting freight, which obliges "a shipper to wait while a vessel is repairing, or to pay freight," but the ordinance does not, he continues, re-quire him to contribute to the expenses of refitting, or those

caused thereby. The same decision, he adds, is to be found in the laws of Oleron.

Thus far there appears but one opinion among elementary writers, for although they make no particular mention of wages and provisions, it is evident from other expressions, they must have included them in the exemption, to which an owner of goods was entitled. Being a charge as much arising out of the peril encountered as any other, they could perceive no reason for a distinction, the merit of which is, perhaps, exclusively due to Ricard, who is mentioned by Emerigon as the first who undertook to differ from all the authors whom he had just named. He then cites his opinion, which no subsequent writer has ventured to approve in its whole extent; for the repairs of a ship, after a storm, are by him brought into general average, as well as seamen's pay and provisions. In truth, he excepts nothing, but includes every expense occasioned by the disaster. Indeed, if he be right in throwing any one of these items into a general average, he *must, [*273] probably, be so throughout. For why shall the pay of the crew be a general, while the wages of the workmen are a particular, average? Or why shall the provisions of the former fall under one description of averages, and those of laborers under another? Or why must the cost of a mast be borne by the owner himself, or his underwriter while the charge of keeping the sailors, while it is putting in, must be divided between freight, ship, and cargo?

*Ricard*, no doubt, found it difficult to make a distinction, and therefore determined not to differ by halves from the jurists who had preceded him. As he is perhaps the only writer (for Beawes only copies what he says) who is found to maintain this doctrine, I shall be excused for adhering to an opinion which is certainly sanctioned by far the greater part of those who have left us their sentiments on the subject. This will appear to be the case to any one who will be at the trouble of consulting *Emerigon*, who, it

is proper to observe here, admits that the practice of the French courts of admiralty, contrary, however, to the civil jurisprudence of the country, conforms to the opinion of Ricard as far only as respects the expenses of unloading and reloading and the wages and provisions of the crew.

Another argument against making these expenses a matter of general assessment, arises from the extreme difficulty and embarrassment which must ever attend the adjustment and collection of them. To value the vessel, freight, and goods, so as to do justice, is never an easy task. In the case of a general ship, and fifty or more shippers, as may well happen, what trouble will not the owner have to discover the just value of every man's interest, and what disputes, vexation, and delay must he submit to, before he receives one half that is due to him? To recover one hundred dollars for wages and provisions, he may have to look to as many shippers, and have a controversy with every one. All this may be avoided by making these expenses, as naturally they are, a particular average.

My apology for the length of this opinion will be found in the importance of the question, than which few can occur more interesting to the mercantile world. I sincerely hope that the inconveniencies, which are apprehended from a practice under the rule which it has been thought fit to adopt, may exist in imagination only.

Upon the whole, as the injury which happened [\*274] here was \*not in itself an object of general contribution; as the plaintiffs were under contract to *repair*, *victual*, and *man* their vessel, throughout the voyage, or lose their freight; as the defendants received no benefit but what the plaintiffs were under positive stipulation to confer; as their *own* and not the common interest was the sole object; and as a contrary rule may produce great inequality, embarrassment, and delay, my opinion is, that the charge for these *extra* wages and provisions is a

particular average, to be borne by the freight only, and that, therefore, the defendants ought to have judgment.(a)

Judgment for the plaintiffs.