The facts and the points raised by the counsel, sufficiently appear in the opinion of the court.
By the Court. Hoffman, J.
The material facts of the case upon which the decision must rest, are these:—•
The ship Galena sailed from New Orleans, bound for Havre, in July, 1853. The cargo was chiefly cotton, with a few thousand staves, and eight kegs of specie, six of which were shipped by the *312 defendant, and two by other persons. On Saturday the 23d July, the ship was struck by lightning between one and two o’clock. It struck the mizzen topgallant-mast, passed down the mizzen-mast into the cabin, and into the between-decks. In five minutes the ship was discovered to be on fire. Holes were cut in the upper deck, around the mizzen-mast, and water poured down into the between-decks, where the cargo was. This had no effect. The holes were then stopped up to stifle the fire. This was between three and four o’clock. The fire still continued. The mate was sent to a brig, the Anna Margaretta, in sight, and signals of distress were made. The brig was going the same course, and had been seen all .the morning from daylight. The mate went on board the brig, and returned about five P. M. It seems pretty clear that the fire began about one or two o’clock p. M., civil time, of the 23d. The passengers and baggage were transferred to the brig by ten or eleven at night. The captain of the brig was requested to keep company for the night, which he did. The holes of the ship were reopened, and water poured down all night. In the morning the deck was hot; the fire appeared to gain. At daylight the captain concluded that he could not put the fire out, and must make a port of distress. An arrangement was then made with the captain of the Danish brig, by which she was to accompany the Galena into Charleston, and to take the specie on board his vessel. This was done because he had the passengers on board, and as a protection to the crew, in case they had to leave the ship if the fire burst out. The specie was put on board the brig because it was safer there, as in case the fire broke out it might be too late to transfer it from the ship.
Captain Beesen, of the Danish brig, was told that he would probably get his pay as salvage, either by the court or by a settlement. There was no bargain or understanding as to the amount. Both vessels bore away for Charleston. The fire did not appear to decrease. At two o’clock of the 26th they hauled into the wharf. The engines of the city then commenced playing into the ship, and she sank to the upper deck. She was filled with water. The cotton absorbed a good deal of the water as it went down. The ship lay full of water twenty-four hours. After that she was pumped out, and they commenced discharging the cargo. The water poured in before the arrival may have touched fifty to sev *313 enty-five bales of the cotton; the water poured in at Charleston covered the whole of it.
The captain determined, in the exercise of his own judgment, and without advice, to abandon the voyage. He sold the cargo at Charleston, and remitted the funds. He made some slight repairs, but only what was done by his own carpenter, and brought the vessel to Hew York, where repairs to a large amount were made, as hereafter noticed.
While in the harbor of Charleston, and before reaching the wharf, the captain of the Galena got the specie from the Danish vessel and deposited it in bank.
The adjustment of the general average took place at Hew York. The statement annexed, A, is an analysis of such adjustment, the document having been furnished us. It shows that the losses contributed for amounted to $73,964.72. Of this sum, $5,120.37 were allowed the Danish brig; and $5,198 to the fire-engine companies at Charleston, both fixed by the Chamber of Commerce. The expenses at Charleston, $4,738.88, consisted of charges for discharging the cotton, piling it on the wharf, landing, storage and weighing, insurance and watching, commissions on the sales of cotton, wages and provisions. The aggregate of the sums allowed in general average of expenditures at Charleston, is $15,057.25. At Hew York repairs are allowed to the amount of $4,285.17. There is also allowed loss on cargo, by scuttling, $42,588.07; loss on freight, $8,880.05; on passage-money, $703.17; adjustment fees and commission for collecting the general average, make up the total amount of $73,964.72. The result is, that 45.09| per cent, is to be paid by all the contributory interests, to make good these losses. The specie represented by the defendant, ($30,853,) is made to pay $14,364.36. The residue of the specie, owned by Rousseau, ($9,110,) is to pay $4,108.23.
I. The proposition chiefly argued by the counsel of the defendant is, that-the specie transhipped into the Danish brig was not subject to the general average expense of the bearing away of the Galena to Charleston, nor the general average expenses, or losses, incurred there or at Hew York. That even admitting that the residue of the cargo, or the vessel, were liable for any other loss than the salvage paid to the Danish brig, the specie is exonerated from it. That it was separated from the vessel and residue of the *314 cargo; no longer in a common peril; subject only to the peril attending the Danish brig, and hable only for a due proportion of the salvage awarded to that brig.
On that basis it will be seen that even if the whole of the salvage of $5,120, is borne by the whole of the specie, ($89,963,) there Would be only a percentage due of about 12? per cent., or about $3,933. This becomes, therefore, a very important point. As $4,364.36 has been paid, there would then be a balance to be recovered by the defendant, if he is right. .
The most analogous cases to the present, which I have found, are those relating to the placing of part of the goods of a ship on board of lighters or other vessels. The rules which have been applied in such cases, will, I think, afford a principle sufficient to govern this cause.
In the case of the ship Couronne de Rochelle, stated by Hagens, (vol. 1, p. 160, case ix.) the vessel sprung a leak, which the utmost exertions of the crew could not keep under. She had sailed with convoy, and after signalling the distress, the boats of several ships came alongside to lighten her, to search for the leak, and to stop it. These boats took from the ship sixty-eight casks of indigo, and one hogshead of white sugar. These were distributed among the different vessels, and after diligent search, the leak was found and stopped. About twenty of the casks of indigo, and the hogshead of sugar, were put on board vessels which were afterwards captured by the English. The ship arrived safe at Rochelle, to which port she was bound. The residue of the indigo was delivered safe in Erance by the vessels to which it was transferred.
The general average- was adjusted by allowing the invoice cost at St. Domingo, of the twenty casks of indigo—deducting ten per cent., a usual deduction for waste—the value of the hogshead of sugar, the freight of the indigo and sugar lost, the freight paid the other vessels for that delivered, and the expenses of adjustment.
The contributory interests were the residue of the cargo at the same valuation; the indigo and sugar, both that delivered and that captured; half of the value of the ship, appraised according to the condition she was in at the time of the average; and one half of the freight, including that of the indigo and sugar taken.
In comparing this leading case with the present, we find some points of material resemblance, and some of important difference. *315 The goods which were taken on board the assisting vessels, and were saved, lost nothing of their character of goods, still following the fate of the vessel and residue of the cargo, and were as liable for any proper contribution as the goods which remained on board. So the goods which were transhipped and lost by the capture, retained their relation to the ship and other parts of the cargo, so that their loss was to be paid for in due proportions by such ship and cargo. The difference is, that the indigo and sugar were designedly transhipped, to enable the parties to get at the leak, and preserve the ship and cargo.
The foreign authorities declare that the loss of merchandise placed in boats to lighten a vessel entering a port or river, shall be shared by the vessel and her cargo. The goods are considered as if they had been thrown into the sea. Such authorities are cited by Emerigon. (Meredith’s ed., p. 474.)
But the rule is subject to qualification, where the vessel requires to be lightened in order to enter her port of destination. In the latter case, no contribution can be claimed. (Pothier des Avaries, N. 140; Beneclce, p. 206.) The captain and owners should have been aware of her draft, and of the water at the port. Emerigon states, also, another exception, viz., where the goods are put on board lighters, to be delivered to the owners or consignees.
The case of Beavan v. The Bank of the United States, (4 Wharton, 801,) has been chiefly relied upon by the counsel for the plaintiff. Notwithstanding that case, Mr. Phillips, in his last edition, (1854,) states the rule to be, that goods or any interest are not liable to contribution for any general average or expense incurred subsequently to their ceasing to be at risk. (vol. ii, p. 155.) He cites Dunham v. The Commercial Ins. Co., (15 Johnson, 315,) and proceeds to comment upon Beavan v. The United States Bank. He thinks that the specie, in that case, could not, upon principle, be distinguished from the case of part of a cargo delivered to a consignee, before the damage was incurred. In that case, specie, part of the cargo, was carried on the ice, and conveyed to Philadelphia by land. The vessel was ice-bound, and in imminent peril. Philadelphia was the port of destination. Considerable expenses had been incurred subsequent to the removal, from placing the cargo in lighters, reshipping it, and otherwise. For such expenses contribution was claimed of the specie.
*316 Dunham v. The Commercial Insurance Company settled, that when, the cargo had arrived at its port of destination, and had been delivered, and freight earned, it could not be made to contribute for subsequent expenses and charges; such as the expenses for wages and provisions, while the vessel was in dock to repair the damage sustained on the voyage. Such expenses could not be considered as incurred for the benefit of freight or cargo.
Lewis v. Williams, in this court, (1 Hall’s Rep. 430,) establishes the rule, that where goods are placed in lighters, upon the vessel stranding in the harbor of her destined port, and some of them sustain a damage, this shall be allowed in general average as well as the expenses of the transportation. The vessel was got off, but, in proceeding up the bay, was again stranded, and lost. The contributory interests were the freight, and the cargo at the invoice prices. The vessel was not claimed for, nor brought in as a contributory interest.
We find, in this case, the principle, that as to the goods in the lighters, there continued a common interest and common liability. There was no severance of the connection, even although they were in progress of being delivered from a part of the harbor to the port of destination.
The Case of Whittridge v. Norris, (6 Mass. Rep. 125,) is carefully examined by both Chief Justice Jones, and Mr. Justice Oakley, and shown to be entirely consistent with their decision.
The attempt is made to treat this as a naked case of the salvage of the specie, for which it should bear its proper share of the amount awarded to the Danish ship, and that no part of the general average expenses ought to be charged to it.
The cases of salvage in behalf of a stranger are, in strictness, when the property is abandoned, or derelict, or the vessel has been recaptured. The salvor takes possession, which he has a right to retain, although the actual property of the owner is not divested. But to the extent of his lien, the salvor’s possession and right are absolute and exclusive. The mere temporary absence of the owner to obtain assistance does not destroy his exclusive right of possession. (The Bee, Ware’s Rep. 332; Lewis v. The Elizabeth, id. 41.)
If we attempt to separate the delivery of the specie from every other part of the transactions between the masters of the vessels, *317 we shall find it very difficult to consider it as a case of salvage proper. There was the consent of the captain of the Galena that the other should have the temporary custody of the specie, for the better chance of preservation, with a right to reclaim possession, and the actual exercise of that right in the harbor of Charleston, by consent. The owner of the Danish vessel was content to look for his compensation to the judgment of a tribunal, or an adjustment by consent. The case has a close resemblance to the freight which, in the case from Hagens, was paid to the two ships which delivered portions of the cargo in safety.
But it is impossible to disconnect any one part of these arrangements and transactions from the other. The whole was one integral and indivisible transaction, growing out of one peril, and controlled by one contract.
The engagement of the Danish brig was for the common benefit. The transfer of the specie was like that of a transfer to a boat or tender alongside, for a temporary purpose.
It is undoubtedly true, that cases of remuneration are not limited to instances of derelict, abandonment, or capture. Services rendered to a vessel in peril, even in co-operation with the master and crew, form a just claim for it.
Thus, in the case of the Elvira, (1 Gilpin’s Reports, 67,) the extra services rendered by a pilot, beyond the mere sphere of his duty, were allowed for. The services were such “ as exalted a pilotage service into something of a salvage service.” The master and most of the crew remained on board. The same was held in the. case of the Wave, by Judge Betts, (1 Blatchford & Howland, 243.) See, also, the ship Henry Embank, (1 Sumner, 414.)
And in Allen v. The Ship Canada, (Bee’s Rep. 90,) a ship was in distress, and the captain of another vessel, at the earnest request of the master, kept company with her, hoisting a light at night, until she was in safety. Compensation was allowed, although the evidence was, that the danger was not imminent. It was not allowed as a strict case of salvage.
These cases justly fall within the observation of Mr. Flanders, that they are not properly matters of salvage, but of a remuneration, pro opere el labore. (Maritime Law, p. 324.)
Nor is it at all anomalous that a case of salvage should form part of a matter of general average, and enter, with other items *318 proper to such a case, into the adjustment. Thus, in the case of the Vreede, (Hagens, 308, case xxv.) two anchors, which had been cut away in a storm, were recovered, and salvage paid for them. This amount went into the adjustment of a heavy case of general average.
The result appears to be, that the specie put on board the Danish brig, continued, as between its owners .and the owners of the Galena and her cargo, precisely as if it had remained on board the latter vessel. It may, indeed, be urged with much force, that had it been lost by the foundering of the Danish brig, it would have been a subject of contribution. But, at any rate, it was temporarily transferred; it was saved. The possession could have been resumed at any time during the voyage to Charleston. It was resumed in the harbor. It was deposited, no doubt at the control of the captain, in bank. It would have been reshipped, had the voyage been resumed. It was, in effect, as much connected with the ship and her voyage, as the rest of the cargo, until the abandonment. We think, therefore, it must contribute for such damages or expenses, being subjects of‘general average, as it would have been liable for had it been kept on board.
II. We proceed to consider which'of the items of general average, allowed .by the adjusters, were proper subjects for it.
And first, as to .the repairs. We conclude, after a careful examination of the adjustment, that a mere trifle, if any thing, was disbursed for repairs in Charleston. The holes, which were cut m the deck at sea, were, no doubt, filled up; and this expense may, perhaps, be a charge for a general average. We presume it too inconsiderable to deserve notice. But when the vessel came back to Hew York, very large expenditures were made upon her, and of those, the sum of $4,738.88, is charged to general average.
The captain states the damage done to the ship by the fire, viz., the burning of the beams of the upper and lower decks, the cabins, some set of knees, some of the timbers, and the mizzenmast between decks. The ship was also greatly injured, he states, by the swelling of the cargo, caused by the water. Ho repairs were done to the ship at Charleston, except what were performed by his own carpenter.
The claim cannot be presented in a stronger light than if the repairs had been made in Charleston.-
*319 We have, then, this point presented: Are the repairs of a vessel, at a port of necessity, when the voyage is there broken up, and the cause of resort to that port was a peril purely fortuitous, subjects of contribution in general average ?
Mr. Abbott states the summary of the English decisions thus: (Ed. Boston, 1854, p. 632,) “It seems to result, that if a vessel goes into port in consequence of an injury, which is in itself the subject of a general average, such repairs as are absolutely necessary to enable her to prosecute her voyage, and the necessary expenses during the stay, are to be considered as general average.” See, also, Hull v. Jacobson, (29 En. L. and Eq. Rep. 116.)
Mr. Flanders, (Maritime Law, p. 268,) considers the English rule to be, that contribution is due for repairs absolutely necessary to enable the ship to perform her voyage.
In Paddelford v. Boardman, (4 Mass. Rep. 348,) it was decided that wages and provisions are to be allowed during a detention in a port of necessity, arising from stress of weather, but not the repairs of the ship.
In Williams v. Suffolk Ins. Co., (3 Sumner, 510,) Justice Story held, that the expenses of going into a port of necessity, to refit, could only be a general average, when the voyage has been resumed, or might have been; not, if it is abandoned from necessity.
In Meyers v. The Harriet, (Adm. Eastern Dist. Penn., July, 1848, cited Wheaton’s Digest, vol. 2, p. 48,) it was ruled, that the expenses and costs of the repairs of a vessel, in a port of necessity, do not constitute a case of general average against the cargo, where it is found impossible to proceed on the voyage, which is then broken up.
Walden v. Leroy, (2 Caines’ Rep. 262,) is expressly limited to a contribution for wages and provisions: and Chief Justice Kent distinguishes the case from that of the repairs themselves, as settled in the Digest, (14, 2, 6.)
In Patter v. The Ocean Ins. Co., (3 Sumner, 28,) wages and provisions were allowed, and not repairs. It is true, the point was not raised. '
Thornton v. The United Ins. Co., (3 Fairfield, 150,) is to the same effect, viz., to allow wages and provisions.
In Brooks v. The Oriental Ins. Co., (7 Pickering, 259,) the repairs *320 necessary to enable the vessel to return home, from a port of necessity, were allowed in general average.
As to the case of Barker v. The Phoenix Ins. Co., (8 John. Rep. 307,) two observations are to be made. The reporter, in the head note, states that the repairs, in Copenhagen, were included in the general average allowed. The probability is, that they were not included. The accounts produced, (p. 310,) included the expenses of the vessel, including repairs, captain’s^nd seamen’s wages, provisions, and all the other expenses in relation to the vessel and cargo; and the claim was for all these, except such asevere properly chargeable to the vessel, as a^particular average. jjbhief Justice Kent, in delivering the opinion of the court, sajé, that the objection is, that the defendants are charged with the cargo’s proportion of a general average, arising from the unloading and storage of the cargo, and the wages and provisions of the crew, during the time the vessel was detained at Copenhagen to refit. He refers to Walden v. Leroy, (2 Caines, 263,) as deciding the point. (See supra.)
But, besides, the cargo was reloaded after the repairs were made, with the express intention of proceeding on the voyage, when, for the first time the interdict of the government was discovered.
We may, also, usefully resort to the foreign authorities, for information and guidance upon this subject.
M. Pardessus, in his Droit Commercial, (vol. 3, article 739,) observes : “ The right of those attempted to be charged, to examine into the character of the accident, and the primary cause of the disaster, is clear. A distinction will here be necessary. The tempest, the lightning, or other cause, has broken the masts. It is a case of simple average. But the impossibility of navigating the ship, compels a resort to a port of necessity, from the danger of perishing. That detention, (reláche,) and the expenses attending it, are matters of common contribution; but not the disbursements for repairing the ship, or of replacing it in the same condition, (de radoub et de la remise era état de navire.) The deliberation which has caused the destruction has not changed the character of the previous accident.”
M. Lemonnier, in his Commentary upon Maritime Assurance, (Paris, 1843,) discusses the general question, in regard to the wages, and provisions, and other expenses of such a detention, *321 when the cause is a mere peril of the sea; and upon a critical examination of the 400th and 403d articles of the Code of Commerce, concludes, that even these ought not to be brought into a general average. He makes the following judicious observations, (vol. 2, p. 109, art. 303 :) “ The expenses which are allowed, as averages in gross, are not so classed by the legislature, because they concern at once the vessel and the cargo, but because they have been voluntarily, or necessarily incurred for the common safety. A jettison is made to lighten the ship during a tempest—masts are cut away—anchors abandoned. These acts cause a loss, or involve expenses; but it is not the maritime fortune which is the cause of them, it is more or less the occasion, but it is the will, the intelligence, and the hand of man, which determines and effects them. It is by the infallible sign of the concurrence of the human will, that we recognize a gross average.”
" Every leak places, more or less, the cargo in danger. It is interested in having that leak stopped. On that ground, not ineptly the expenses of the detention, but the repairs themselves, ought Mfce found among gross averages.” He closes thus: “ The detentionnis as fortuitous as its cause. The disbursements rendered necessary by it, are, in reality, only a forced consequence of the prior average, and the same reason which forbids us to treat, as a common average, the expénses of the repairs, commands us to class, as particular average, the expenses of the detention, an indispensable preliminary of those repairs.”
In support of these views, he cites the decision of the Court of Cassation, (in 1841,) admitting, however, that other decisions are to the contrary.
M. Boulay Paty, the editor of Emerigon, in his work entitled Cours de Droit Commercial, (Paris, 1834, vol. 4, p. 432,) discusses this subject, and concurs withLemonnier in his conclusions. Emerigon inclines to the opinion, that repairs necessary to render the vessel navigable, made at the port of repose, are proper objects of contribution. (Meredith’s ed. 482.)
The celebrated case of the vessel from Ostia, cited from the Roman law, (Emerigon, p. 481,) is exactly in point, to show that the repairs are not to be allowed. The injury which drove her to Hippone was from lightning.
I think it may be concluded, that the weight of authority is *322 irresistible to prove, that reparations of a vessel, in a port of necessity, where she is driven by a fortuitous cause, are subjects of particular average, with the exception, that if they are incurred to repair a loss which is itself a subject of general average, they may be treated as common averages; but only to the amount fnecessary for that purpose.
| We consider, however, that there is one exception to this rule I in the present case. The damage to the vessel, caused by the swelling of the cargo, from the water poured down, may be allowed. What can be distinctly traced to that cause, that is, what lit would have cost to repair that specific damage, should be contributed, and no more. We call attention to the item of $2,542.50, which appears to be for coppering, and to similar items, whether they fall within this rule.
The adjustment must be examined, and if necessary, corrected, so as to limit the amount to be allowed for repairs to the sum essential to repair that injury which was caused by the swelling of the cargo.
2d. The expense of hiring the fire-engines, was incurred to put out the fire, and was for the common benefit of cargo and vessel. We consider the specie as still on board, liable for what any other part of the cargo was responsible. Such an expense was justly chargeable upon the residue of the cargo, as well as upon the vessel.
3d. The next subject of consideration is the freight. The adjusters have found, as I understand the adjustment, that the whole freight list was $9,562.66, and have deducted for freight on one hundred and forty-seven bales burned, $682.61, leaving to be paid for, $8,850.05. This amount is to be made good, and the contributory amount which the freight pays, is $4,004.87. The owner of the freight, here the owner of the vessel, will receive the balance of $4,875.18, less what he contributes as owner of the vessel.
It may be taken, as a general rule, that a claim for freight follows the fate of a claim for the vessel. If a vessel is lost under circumstances which make her loss a case of general average, the freight, which is lost, is an additional sacrifice of the owner. It has been earned in part, and would have been earned in full, but *323 for the voluntary act which entailed the loss of the vessel, and, of course, prevented the earning of the freight from, the shippers.
In the case of Gray v. Waler, (2 Serg. & Rawle, 229,) the act was deliberate, and necessary for the preservation of the cargo. The vessel was so much injured as to be condemned and sold. The cargo was accepted by a sufficiently authorized agent, at the port of disaster. Freight, pro rata, was due. The vessel was allowed, at the value when she sailed, deducting deterioration for her wear and tear, and the freight which had become due, _pro rata.
In the Columbian Ins. Co. v. Ashley, (13 Peters,) as the vessel was wholly lost, and yet allowed for, the freight was alldwed as its accessory.
But when it appears that the ship, the source of the freight, is not to be allowed for, when the voyage is broken up, and no freight can be recovered from the shippers, when nothing to which the owner is entitled, is given up for the benefit of others, a claim for contribution cannot be sustained. Contributors to general average are not insurers of the freight.
Of course, if freight cannot be allowed for, it cannot be called upon to pay.
4th. Next, the adjusters have allowed for damage to the cargo, by reason of what they call the scuttling, the sum of $42,513.07, and make the whole cargo, at what I understand to be the invoice prices, to contribute for it, viz., $134,000.
It is not strictly accurate to say that there was a scuttling at Charleston, although acts were done purposely to hasten the sinking of the ship. She was filled with water, by streams from the engines, in order to extinguish the fire, and some damage to the cotton resulted from this.
Mr. Benecke states the rule, applicable to this branch of the subject, thus: “ If water is poured down the hatches of a vessel to extinguish a fire, in the hold or between decks, this must be considered to be done with the double purpose, of saving the articles which have already caught fire from utter destruction, and of extricating the vessel and rest of the cargo from an imminent danger. The effect of the water upon the former goods is, therefore, particular average; it is not an injury, but a real advantage to them. But the damage done, by the water, to the other goods, is, I conceive, of the nature of a general average.” (Benecke, p. 165.)
*324 The invoice amount of the cotton is ascertained by deducting the amount of the invoices of the other portions of the cargo from the whole of the invoices. The following statement shows the result:—•
Total amount of invoices, .... $134,000 02
„ Specie, .... $31,853 00
Specie, .... 9,110 00
Trunk, .... 100 00
Staves, .... 341 25
$41,404 25
Case of snuffj 25 00 41,429 25
The invoice amount of the cotton must then have been............... 92,570 77
SALES.
Of cotton damaged by water, .... $48,739 21
Of cotton by fire, ....... 1,359 70
$50,098 91
50,098 91
$42,471 86
Damage to cotton, by the adjuster’s statement, as arising from the scuttling, as he terms it, . . . $42,513 07
Difference,.............. $41 21
The number of bales of cotton which were injured by the water can, no doubt, be ascertained from the account-sales; and the comparison of the invoice cost, of such number of bales, with the proceeds of the sale, would give the damage.
. If the loss upon the cotton, by the water, was arrived at in the manner I have suggested, it would be liable to this objection: the sales, which produced $48,739.21, may have been of two-thirds of the whole cotton, or say about $61,700. The actual loss would then be the difference only, about $13,000. The fire may have diminished the value of the other third so greatly, as to make it yield but the $1,359.70. In other words, there may have been nearly a total loss of one third of the whole amount of cotton, by *325 the fire, and a loss of about twenty-one per cent, on the other two-thirds.
The result which the adjuster has reached may, however, be entirely accurate. It is necessary that he should state the process by which he arrived at it. The principle is before given.
5th. There is the sum of $4,738.88, charged in general average expenses at Charleston. A large part of the items is stated in the schedule annexed to this opinion, amounting to $3,591.13. There are, for example, the charges: $650, for discharging cotton and pumping out water; for landing, storing and weighing cotton, $959.15; commissions on sales of cotton, $1,218.48; wages, provisions, &c., $291.43.
We do not see upon what ground the most of these charges are made subjects to be contributed for. If, indeed, expenses had been incurred in landing part of the cargo, in order better to empty the vessel of the water, they might be, perhaps, properly allowed; but we understand that the water was pumped out before any portion of the cargo was landed.
Again, if the cargo was landed, and expenses incurred with a view to the resumption of the voyage, a claim for such expenses might be valid. But, we presume, the cargo was landed, if not after a determination to break up the voyage, yet, at least, without a view to its continuance. If, however, such expenses were incurred with a view to decide, as to the resumption, they may be proper. The adjuster, or referee, may inquire into this matter, and make such allowance as shall be proper, if the facts will warrant it.
The parties can probably settle, upon these principles. If not, there must be a reference, to revise and correct the adjustment. The order will be drawn up by the attorney of the plaintiff, and submitted, for settlement, to one of the Judges.
A.
ANALYSIS OF THE ADJUSTMENT OF THE GENERAL AVERAGE.

Losses contributed for.

Danish brig, . . . . $5,120 37
Fire-engine company, 5,198 00

*326
Sundry Expenses.

Discharging cotton and pumping out water, $ 650 00
Piling cotton on wharf, ...... 238 37
Landing, storage, weighing cotton, . . . 959 85
Insurance on the cotton on the wharf, . 101 00
Watching ship and cargo,...... 132 00
Commission on sales oí cotton, .... 1,218 48
On $48,739.21, by water only.
On $1,359.70, by fire only.
Wages, provisions, &c.,. ...... 291 43
/ $3,591 13
Sundry other items, ........ 1,147 75
4,738 89
Total charged to general average at Charleston,. . $15,057 25
Proportion of expenses of repairs in New York, Among the items are these— 4,285 17
1,386 sheets Y. metal, 10,170 lbs., at five cents, ...... $2,542 50
Refastening, caulking, coppering, . 1,218 00
600 bushels of salt,...... 250 00
$4,010 50
One third off, 1,336 83
$2,673 67
Captain Leavitt, discount paid on remitting) $39,000 to New York,.......) 195 00
$19,537 42

Cargo.

Loss on cotton by scuttling, .... $42,513 07
Snuff, $25 ; clothing, $50,..... 75 00
42,588 07

Freight.

Freight list,..........$9,562 66
On 147 bales burned,...... 682 61
8,880 05
Loss in passage-money,.......... 703 17
Adjusting, $450; bond, $2; commissions collecting general average, $1,804.01,....... 2,256 01
Amount to be contributed, $73,964 72

*327
Contributory Interests.

Vessel valued at....... . $28,000 00
Less repairs particular average, . . . 8,088 26
$19,911 74
Freight made good,......8,880 05
Passage at time of sailing, .... ..... 1,225 00
Cargo,..........134,000 02
$164,016 81
$164,016.81: 73,964.72 about 45.09* net.

Batschild, Brothers.

Defendant—
On $31,853; specie, 45.09*,.....$14,364 66
H. Rousseau, ........' . $4,108 23