## THE ROANOKE.

*(District Court, E. D. Wisconsin. June 4, 1891.)*

1. GENERAL AVERAGE—DAMAGE BY WATER.
    Damage by water poured upon cargo to extinguish fire is the subject of general average. *The Buckeye*, 7 Biss. 23, disapproved.
2. SAME.
    Whether so, when the act of flooding was that of municipal authorities, without concurrence or direction of the master, *quœre.*
3. SAME—LIABILITY OF SHIP-OWNER.
    The statute (Rev. St. § 4282) exempting the ship-owner from liability for damage to cargo by fire, happening without his neglect or design, does not release from liability to contribute towards general average.

*(Syllabus by the Court.)*

In Admiralty.

The libel was filed by certain underwriters against the steamer Roanoke, in a cause of general average, civil and maritime. The libel charges that the Roanoke on the 17th May, 1890, was lying at her dock in the port of Buffalo, bound for Toledo, partly laden with a cargo of merchandise consigned to Toledo, consisting principally of pipe-clay, plaster, cement, jute, cases of envelopes, and spiegel-iron. During the day the steamer was taking on cargo until 7:30 P. M., when fire was discovered in the mid-ship hold, among the jute. Thereupon an alarm was given by the officers of the vessel, promptly responded to by the fire department of Buffalo and the fire-tug City of Buffalo. The lines were cut and the steamer taken to the life-saving station opposite her place of mooring, and water poured upon her to extinguish the fire. The damage to the steamer by fire was confined to her upper works and main deck. Such fire was extinguished by 10:30 P. M. Large quantities of water were necessarily and continuously poured into the hold for the purpose of extinguishing the fire in the cargo, until 6 A. M. the following morning, up to which time the jute continued to burn and smolder. On the morning of the 19th fire was again discovered in the jute, and it became necessary to procure a line of hose from the fire department, and pour a stream of water continually on the jute for over an hour, when the fire appeared to be extinguished. At 3 P. M. of May 19th the steamer departed on her voyage for Toledo. On the trip it was necessary, at intervals of about two hours, to pour water, with the steamer's hose, on the jute, as fire was constantly breaking out, and this was continued until her arrival at Toledo, at 3 P. M. on May 21st. The next day, the

22d, at 4 A. M., while unloading cargo, fire was again discovered in the jute remaining in the after-hold, and was extinguished by pouring water upon it for about one hour, when unloading the steamer was finished. The cargo was damaged by water, as set forth in the general average statement annexed to the libel. The libelants were underwriters, respectively, of certain respective shipments of cargo, and paid to the respective owners, respectively, the amount of damage by water to their respective shipments, respectively insured. The libelants claim that the several amounts paid by them were general average charges, and to be contributed for as declared in the general average adjustment, and claim, by subrogation, to recover from the Roanoke the sum of $2,505.62, with interest from September 16, 1890, in general average contribution. Exceptions are filed to the libel, asserting that the facts stated are insufficient to support a decree.

*John C. Richberg*, for libelants.

*P. H. Phillips* and *Geo. D. Van Dyke*, for respondent.

JENKINS, J., (*after stating the facts as above.*) The record presents the question whether contribution in general average is sanctioned for damage by water poured upon cargo to extinguish fire on board ship. The principle which underlies the whole doctrine of general average is that a loss voluntarily incurred for the sake of all shall be made good by the contribution of all. *Insurance Co.* v. *Ashby*, 13 Pet. 331; *Hobson* v. *Lord*, 92 U. S. 397. The maxim of the Rhodian law, the foundation of general average, did not in terms extend further than to cases of jettison; but the principle applies to all other cases of voluntary sacrifice, properly made, for the benefit of all. *Anderson* v. *Steam-Ship Co.*, L. R. 10 App. Cas. 107, 114. The maxim itself, as suggested by one author, is probably an imperfect statement in writing of the principle known to the common law of the seas, illustrating the general principle by a perfect example. To justify general average contribution three things must concur: (1) A common imminent peril; (2) a voluntary sacrifice; (3) successful avoidance of the danger. *Barnard* v. *Adams*, 10 How. 270; *The Star of Hope*, 9 Wall. 203. The first and third conditions are confessedly here present. The second condition is said to be wanting, because, as is claimed, the cargo destroyed was not "selected" for sacrifice; or, in other words, that the loss was incidental and unintentional, not primary and designed. There must be, it is true, a deliberate sacrifice to appease the exigency of the crisis, as distinguished from the chance result of the operation of the natural elements. I take it, however, that the term "sacrifice," as known to the maritime law, is used in the sense of giving up or suffering to be lost for the sake of something else, not in the sense of an immolation. Was there not here, within the principle of contribution, such designed injury, such deliberate sacrifice? Both ship and cargo were in the embrace of total destruction. Deliverance was only possible through extinguishment of the fire. There was certainty that pouring water into the hold to drown the fire would destroy cargo not on fire. That was a necessary result of the

act. There was the will of man directing the act working destruction to cargo. There was intentional inundation of cargo. There was design to avert the greater loss of ship and cargo, by incurring the minor loss of part of the cargo. That, in my judgment, is equivalent to a voluntary sacrifice, satisfying the conditions of a general average act. It was a selection by the master for sacrifice of that which by the act must necessarily be destroyed. There was, to be sure, no manual selection, no separation of the "scape-goat" from the remainder of the cargo, no particular design to destroy the particular subject. But that is not essential. It suffices if there exist the general design to sacrifice that which would naturally be lost in consequence of the act rendered imperative by the impending peril. The master must be presumed to have designed the consequences necessarily resulting from the act directed. The cargo so necessarily destroyed by the act is, in every equitable sense, selected for sacrifice. Many losses in the nature of jettison are thus borne in general average. As for example, goods exposed in barges to float a stranded ship, and lost in consequence; goods brought upon deck in order to get at others for the purpose of a *jactus*, and washed overboard, (Benecke, Ins. 213;) damage done to a ship by a tug coming along-side to render salvage service, (Loundes, § 33;) the voluntary stranding of a ship to avoid capture, foundering, or shipwreck, (*Fowler* v. *Rathbones*, 12 Wall. 102;) damage to cargo, resulting from such stranding, (Loundes, § 16.) In all these cases there is, in a narrow sense of the term, no design to destroy, no selection for sacrifice. The purpose is to save, not destroy; a lesser peril is incurred to avoid certain loss from a greater one. The act, however, is hazardous, resulting in injury. The results are presumed to have been foreseen; that destroyed presumed to have been selected for sacrifice. The loss is compensated in general average as a necessary consequence of the measure taken for the common safety. I am of opinion that the loss here falls within the conditions of general average contribution. This conclusion is, as I think, supported by the decided weight of judicial authority in America, speaking to the precise question. *Nimick* v. *Holmes*, 25 Pa. St. 366; *Nelson* v. *Belmont*, 5 Duer, 310, affirmed on appeal, 21 N. Y. 36; *Heye* v. *North German Lloyd*, 33 Fed. Rep. 60; *Ralli* v. *Troop*, 37 Fed. Rep. 888. It is the settled law of England. *Stewart* v. *Steam-Ship Co.*, L. R. 8 Q. B. 88; *Achard* v. *Ring*, 31 Law T. (N. S.) 647; *Schmidt* v. *Mail Steam-Ship Co.*, 45 Law J. Q. B. 646; *Pirie* v. *Dock Co.*, 44 Law T. (N. S.) 426; *Wire, etc., Co.* v. *Savill*, 8 Q. B. Div 653. It is the law of France, Belgium, Germany, Italy, Holland, Sweden, Norway, Denmark, and Portugal. (Loundes on General Average, Comparative Table, xxxi. and appendices.) It accords with the York-Antwerp rules of 1877, which, while without the sanction of law, are now generally adopted in marine underwriting, and in foreign bills of lading.

The case of *The Buckeye*, 7 Biss. 23, decided by Mr. Justice DAVIS in 1863, is strongly urged as decisive here. The decision there is certainly counter to the conclusion I have reached. The argument of the opinion is that there must exist a particular intention to destroy, and a particu-

lar selection for destruction. *Barnard* v. *Adams*, 10 How. 270, 304, cited in support, determines that contribution is not dependent upon any real or presumed intention to destroy, solely upon selection. *The Star of Hope*, 9 Wall. 203, 233, decided in 1869,—while Mr. Justice Davis was yet upon the supreme bench, and in the decision of which he participated,—determines that if the will of man in some degree contributed to the sacrifice, that is sufficient to constitute the voluntary act or selection within the meaning of the commercial law. There the ship, in imminent danger of destruction from fire, sought safety in an unknown bay. In attempting to enter she grounded upon a reef or bank, the existence of which was unknown to the master. It was said there that the stranding was not only not intentional, but was involuntary and unexpected. But the court answered that, being aware that such a danger was the chief one to be expected in entering a bay, he deliberately elected to take the hazard rather than subject the common adventure to the imminent peril, and to almost certain destruction if he remained outside; and that it was not possible to hold, under such circumstances, that the will of man did not in some degree contribute to the stranding of the ship. That case goes far beyond the one in hand, and seems to me wholly irreconcilable with the case of *The Buckeye*. There, was only possibility without expectation of loss; here, was certainty. The will of man in some degree contributed to the sacrifice that in the one case was the possible, and in the other the certain, result of the act determined upon for the common safety. It is with diffidence that I venture to dissent from the decision of *The Buckeye*. I have halted in opinion whether it is not my duty to yield personal conviction to the judgment of the distinguished jurist then presiding in this circuit; but, considering that that decision stands opposed, as I believe, to the principle established by the supreme court, and to the law of nearly every maritime nation, I have felt at liberty to follow my own conviction in the interest of that uniformity of decision especially to be desired in maritime law. If therein I err, an appellate tribunal can set me right.

The objection that the act was that of the municipal authorities, without direction or concurrence on the part of the master, is ill sustained in point of fact. The protest discloses that the alarm was given, and the fire department called into action, by the master of the vessel. The action of the firemen was therefore by his procurement. Subsequent flooding was the direct act of master and crew. It becomes unnecessary, therefore, to consider the cases of *Wamsutta Mills* v. *Steam-Boat Co.*, 137 Mass. 471, and *The Mary Frost*, 2 Woods, 306, to the effect that property sacrificed by direction of others than the master is not a general average loss. The doctrine of these cases is challenged in *Ralli* v. *Troop*, 37 Fed. Rep. 888, 891.

It is lastly objected that neither ship nor owner is liable in general average for the loss in question. This claim is predicated upon Rev. St. § 4282, exempting the owner of a vessel from liability for loss or damage to cargo by reason or by means of any fire happening to or on board of the vessel without design or neglect of the owner. This provision is first

found in 9 St. 635, and was enacted in 1851, and is said in *Moore* v. *Transportation Co.*, 24 How. 1, to have been in consequence of the decision in *Navigation Co.* v. *Bank*, 6 How. 344, applying the common-law liability of common carriers to carriers by water. Its provisions are largely borrowed from similar legislation in England. There ship-owners were first exempted from liability in case of loss or damage by fire by the statute of 26 Geo. III., re-enacted in 17 & 18 Vict. c. 104, § 503. The acts of both nations are essentially alike. The courts of England have ruled that the exemption of the statute corresponds with the ordinary exemption from the accidents of navigation, and does not touch liability to contribute towards a general average. *Schmidt* v. *Mail Steam-Ship Co.*, 45 Law J. Q. B. 646; *Crooks* v. *Allan*, 5 Q. B. Div. 38. Considering the previous state of the law, the object to be obtained, and the history of the legislation, there can exist no reasonable doubt of the correctness of these decisions. That in the law of insurance damage by water is attributed to the original peril by fire as a direct and proximate cause does not warrant a construction of the act in question which would seriously unsettle the law of general average, and was clearly without the intendment of congress. Exceptions to libel overruled.