### MINNEAPOLIS, ST. P. & B. S. S. CO. v. MANISTEE TRANSIT CO.

(District Court, W. D. New York. October 18, 1907.)

SHIPPING—GENERAL AVERAGE—GENERAL AVERAGE LOSS.

The right to a general average contribution can only arise from a deliberate and intentional act of the master of the vessel or other representative of the joint enterprise in sacrificing a portion of the marine adventure, or incurring an extraordinary expenditure, for the joint benefit of all interests; and an owner of cargo injured by water poured into a burning vessel cannot recover contribution in general average from the vessel where the act was not done by nor under the direction of the master, but by the fire department of a city acting on its own authority.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, §§ 598, 599.

General average, see note to Pacific Mail Steamship Co. v. New York H. & R. Mining Co., 20 C. C. A. 357.]

In Admiralty.

Wilcox & Bull and Ansley Wilcox, for libelant.
Goulder, Holding & Masten, for respondent.

HAZEL, District Judge. The libel herein is filed by the charterer of the steam propeller Hennepin against the owner of the said steamship for general average contribution for damages to cargo of package freight sustained in the extinguishment of a fire on the said steamer. A general average statement was made which shows that the proportion for which the vessel is claimed to be liable is $6,525.39, subject to the sum of $1,650 for damages to the vessel.

It is a well-established rule of law that general average contribution is based upon a voluntary sacrifice of a portion of the marine risk which must have been made for the common benefit of the joint enterprise, and, quoting from the Supreme Court in the case of Ralli v. Troop, 157 U. S. 386, 15 Sup. Ct. 657, 39 L. Ed. 742, "for no other purpose." The sacrifice must have been made by the order of the owner, master, or authorized representative. The facts of this case are not thought essentially different from the facts proven in the Ralli Case. There the mate in charge of the vessel during the temporary absence of the master sounded an alarm of fire by ringing the vessel's bell, and a number of the crews of neighboring vessels, hearing the alarm, rendered assistance in flooding the firehold with water. During the progress of the fire the port authorities came with fire engines, poured water into the hold, and generally took charge of the vessel for the purpose of

putting out the fire. In the meantime the master returned to the vessel, but did not object to the operations of those in charge of the fire engines or the attempts to extinguish the fire. The kernel of the decision is found in the statement of the court that the master or mate in charge of the vessel was not in a position to determine the manner in which a portion of the maritime adventure should be sacrificed. Nothing was done to indicate a deliberate purpose to suffer a loss in order to save the rest of the endangered property. The failure to prove that the sole object of the port authorities was to save the ship and cargo was deemed fatal to libelant's right of recovery, and it was accordingly presumed by the court that the primal purpose of the port authorities was to save other vessels and property which might have been injured through the fire. In the case at bar there is no serious controversy as to the facts, but there is in regard to the rule of law.

On June 27, 1901, at about 2 o'clock in the afternoon while the steamer Hennepin was moored at the Lehigh Valley Railroad Company's wharf in Blackwell Canal at the port of Buffalo, fire broke out in the Lehigh Valley freighthouse, which was located adjacent to such wharf, and the fire was soon communicated to said vessel. The line was immediately cast off, and, although some difficulties were encountered owing to the narrowness of the channel and the proximity of a vessel moored forward, she crossed the channel, which at this point was about 200 feet wide, and lay alongside the opposite wharf. The steamboat was enveloped in smoke and flames, and the fire quickly spread to the engine room. The master of the Hennepin repeatedly blew alarm signals on his steam whistle, with the intention, he testifies, of calling for help from the city fire department. He directed the crew of the vessel to couple up the fire hose on the vessel preparatory to pumping water on the fire, but his directions were not carried out presumably because of the density of the smoke and flames. The smoke drove the engineer and his assistant from the engine room, and the master, whose hand had been burned, from the pilot house. Immediately after the vessel was moored to the opposite wharf the master and the ship's husband, who was on board at the time of the fire, hastily left the vessel, and went toward the burning freighthouse about 1,500 feet distant to solicit aid from the city fire department, but they procured no assistance. Meanwhile certain other city fire engines and firemen, responding to a second alarm of fire from the headquarters of the fire department, came to the relief of the burning vessel, and together with the fire tug Hutchinson, which after colliding with the burning steamer on account of the density of the smoke, rendered assistance. After having his burns dressed by the fire department surgeon, who was present at the fire, the master returned to the vessel and found her in charge of the city fire department, which was energetically decreasing the fire. The ship's husband who had returned to the steamer a short time before the master found firemen playing water upon radiators which he stated were not burning, and, supposing that the cargo would be unnecessarily wetted, he objected, but his protest was not heeded by the firemen. The master suggested to the firemen a convenient way to reach the blaze in the hold by cutting through the decks and covering boards, and later, the ship having listed

to port, he and the crew cut out a gangway shutter to allow the water to flow off and endeavor to right the vessel. Late in the afternoon the vessel sank in about 17 feet of water, her upper deck and part of the main deck remaining above the surface. When the fire seemed to be extinguished and the firemen had gone, the master left the vessel, the wheelsman remaining in charge. During that night the fire again broke out in the coal bunkers, but was readily extinguished by the fire department. Nothing was done to segregate the property to make a sacrifice for the joint benefit of the ship and cargo. No directions were given by the master towards sacrificing or saving any property under his dominion. The situation evidently did not afford the master an opportunity for exercising a reasonable judgment as to the destruction of property for the benefit of others engaged in the joint venture. He seemingly was content to allow the fire department to perform their duties, and did not supervise or interfere with their operations, except in one instance to indicate where holes should be made in the deck to insert the nozzle of the hose. It does not appear, however, that the fireman obeyed any directions or followed any suggestions of the master. The thought of sacrificing any part of the package freight for the joint benefit of the owners evidently did not occur to him. Some of the crew were present during the afternoon of the fire, but it is not shown that anything was done by them under directions of the master which would bring the case within the rule of general average. As stated by the Supreme Court in the Ralli Case, supra:

"The question what measures are the best and most prudent, the most feasible and available, to extinguish the fire, or, in other words, what part of the maritime adventure should be sacrificed, and in what manner, for the safety of the rest of the adventure, was to be determined by the master at the time of the emergency; and his determination, faithfully and reasonably made, was, so far as affects the right of mutual contribution between the parties to the adventure, not to be overruled by the municipal authorities at the time, or by the court long afterwards."

Libelant points out the inequity of refusing general average under the circumstances of this case, and insists that the master undertook to exercise authority and control notwithstanding the peremptory acts of the fire department. In the Ralli Case, supra, the Supreme Court considered such a situation, but it firmly adhered to the ancient Roman and Rhodian codes, which manifestly did not contemplate any modern situation by which strangers to a vessel without being under the restraints of the paramount authority of the master should in case of danger assist in the preservation of a ship and cargo. The court says:

"In the execution of this office, and in the performance of this duty, they act under their official responsibility to the public, and are not subject to be controlled by the owners of the adventure, or by the master of the vessel as their representative."

I have examined the decision in The Roanoke (D. C.) 46 Fed. 297, 53 Fed. 270, affirmed in 59 Fed. 161, 8 C. C. A. 67, but, in that case the fire originated on board the vessel, and the District Court found that the master directed the operations of the firemen who were expressly called to help the crew make a sacrifice and save a portion of the endangered cargo. After the fire was thought to have been put out,

the vessel departed on her voyage, but the fire broke out at intervals in different portions of the cargo, consisting of jute stowed in the hold, and was only kept checked by the crew through the steamer's hose at each outbreak. The important features of that case and the case under consideration would seem to be clearly distinguishable.

The libel is dismissed, with costs.