## STAR OF HOPE.

1. To constitute a voluntary stranding of a vessel it is not necessary that there should have been a previous intention to destroy or injure the vessel, nor is such intention supposed to exist. It is sufficient that the vessel was selected to suffer the common peril in the place of the whole of the associated interests, in order that the remainder might be saved.

2. The stranding is voluntary whenever the will of man does in some degree contribute thereto, though the existence of the particular reef or bank on which the vessel grounds was not before known to the master, and though he did not intend to strand the vessel thereon; provided it sufficiently appear that in making the exposure of the vessel he was aware that stranding was the chief risk incurred by him, and that it was not wholly unexpected by him..

3. These principles applied to the facts of this case, and the stranding held to be voluntary, so as to render the damage to the ship thereby caused, and all costs and expenses consequent thereon, a subject of general average contribution.

4. As a general rule the contributory value of the ship, when she has received no extraordinary injuries during the voyage, and has not been repaired on that account, is her value at the time of her arrival at the termination of the voyage. But where, as in this case, the ship has sustained injuries during the voyage and undergone repairs, her contributory value is her worth before such repairs were made. In the absence of other proof on this point, her value in the policy of insurance at the port of departure is competent evidence. From this, however, should be made a just and reasonable deduction for deterioration.

* 1 Greenleaf's Evidence, § 55.

5. The expenses of an *ex parte* adjustment made by the charterers of a ship at the port of delivery are not chargeable in admiralty on the ship or freight, unless the results were adopted and used in the court below by the commissioner who stated the adjustment made under order of the court.

6. Repairs cannot be made by the master unless he has means or credit; and if he has neither, and his situation is such that he cannot communicate with the owners, he may sell a part of the cargo for that purpose if it is necessary for him to do so in order to raise the means to make the repairs. Sacrifices made to raise such means are the subject of general average, and the rule is the same whether the sacrifice was made by a sale of a part of the cargo or by the payment of marine interest.

APPEAL from the Circuit Court for California; the case arising upon an agreed statement of facts, in substance thus:

In November, 1855, the firm of Annan, Talmage & Embury, chartered at New York the ship Star of Hope, the master, officers, and crew being all employed by the owners. They received on board of her, at the port just named, a large quantity of merchandise on freight deliverable at San Francisco, and also merchandise their own property. They received also, on freight, payable to them for and on account of the owners, two hundred and forty-four tons of coal. Among the merchandise shipped by the charterers and the other shippers (not the owners), were five hundred casks and packages of brandy and other spirituous liquors, stowed next the coal, and one barrel and forty-eight kegs of gunpowder, prepared as " patent safety fusees."

With this cargo on board, the ship sailed from New York in February, 1856, for San Francisco, being in all respects during the voyage kept tight, staunch, well-fitted, tackled, and provided with every requisite, and with necessary men and provisions—all which the charter-party bound the owners that she should be—except as hereinafter set forth.

During the voyage, about the middle of April, 1856, the ship being then on the east side of the southern end of South America, and in about latitude 46° S., longitude 53° W., the weather squally and the sea rough, great quantities of smoke and vapor were observed issuing from the fore and after hatches. After as full an examination as was possible be-

tween decks and otherwise, all on board had *every reason* to
believe the ship on fire below, originating as was supposed
in the coal by spontaneous combustion.   The hatches were
immediately fastened down and everything made tight, in
order to check as much as possible the progress of the fire,
at least until a port of succor could be reached.   It was
known that among the cargo were large quantities of spirit-
uous liquors, and of the prepared gunpowder already de-
scribed, all which were believed by every one on board to be
highly inflammable and explosive.   Great alarm was felt in
consequence, and the destruction of the ship, officers, and
crew was apprehended by all.

The crew refused to continue the voyage, and the captain
determined *properly* to make for the Bay of San Antonio, on
the southeast coast of Patagonia, as the nearest anchorage.
In about four days, during which the signs of fire continued
to increase, she arrived off that bay, and *set the usual signal
for a pilot.*

In making ready the anchors and getting up the chains
from below, these were found quite hot, and there were other
signs of fire which greatly heightened the general alarm.

Meantime the weather was such, the wind blowing the
ship right on shore, with a heavy sea running, that she could
not haul off.   The shore being very rocky and precipitous,
she could not have gone on there without certain and almost
instant loss of vessel, cargo, and all on board.   The captain
being very unwilling to run into a *bay unknown to him without
a pilot, waited about three hours for one, but none came.*   The
place, it was evident, was a *wild and desolate bay, without sign
of human life.*   All this time the indications of fire below, as
well as the weather, continued to grow worse.   At length
he determined, as the best thing to be done for the general
safety, and especially for the preservation of the cargo and
lives of those on board, to make the attempt to run in with-
out a pilot, preferring all risks to be thereby incurred rather
than to remain outside in the momentary apprehension of
destruction to all.   Under all the circumstances, the captain
was *fully justified* in this.

In attempting to enter the bay the *lead was kept going,* *showing successively* 8, 7, 6, 5, 4½, *and* 4 *fathoms, and imme- diately afterwards the ship grounded,* and after striking heavily remained fast. The reef or bank on which she grounded was *not visible* at the time, and the captain was *not aware* of its existence, *though her stranding was one of the chief risks he had assumed in undertaking to run in.* The result of the at- tempt was, that before the ship could be got to sea again she sprunk aleak, and sustained other very serious injuries in her bottom.

These were such as to fully justify the captain in turning back with her to Montevideo (as the nearest port) for exami- nation and repairs, there being no inhabitants at San Anto- nio, and no sign of human life, and the water taken in by the ship having apparently extinguished the fire below.

He arrived at Montevideo in the end of April, 1856, and on removing the cargo found marks of fire on various por- tions. *The necessary expenses incurred by the ship at this port to enable her to resume her voyage,* including repairs, unloading, warehousing, and reloading of cargo, &c., were $100,000.

To defray these, the captain, being without credit or means, either of his own or his owners (and there being at Monte- video very little market for such goods and merchandise as the ship had aboard), necessarily sold a considerable portion of the cargo. This sale, both as to the mode and the cargo selected, was managed with all due care for the interest of all concerned. Of the cargo thus sold portions belonged to different parties shipping.

About the 11th September, 1856, the ship left Montevideo, no unnecessary delay having been made there, and arrived at San Francisco on December 7th, 1856.

The goods and merchandise of the several shippers re maining on board were in due time and in good order de- livered to them.

Upon her arrival at San Francisco the said Annan and Embury, and one George Hazzard, who had become the as- signees of Annan, Talmage & Embury, both as to the charter- party and as to their portion of the cargo, and in all respects

the successors in interest of Annan, Talmage & Embury, claimed and obtained the control of the ship and her cargo until the delivery of the latter was completed, and they alone collected and received of the several consignees the freight therefor.   Messrs. Annan, Embury & Hazzard delivered to the several owners the goods and merchandise respectively, first obtaining from them the amount of their several contributions to the general average, and they also received so much of the cargo as was deliverable to themselves.

Of $36,000, the price and hire fixed in the charter-party, $9822.20 was paid either by the charterers or their assignees.

The expenses properly and necessarily incurred by the ship, from the day when her course was first changed for San Antonio, until the day she resumed her voyage; the freight due at San Francisco on the several portions of the cargo not delivered there to the several owners; the value at San Francisco of the ship and of the entire cargo, as well as of the portion delivered there, were matters which were all agreed upon by the parties; though the value of the ship at Montevideo was not known.

In this state of facts, Annan et al., the charterers, and fourteen other parties, shippers, and a sixteenth party, Embury et al., filed, in March and April, 1857, in the District Court, libels against the ship, then in the port of San Francisco. Annan & Co. for $44,700, and Embury & Co. for $10,115.

The libels, except the last, were in the same form, and were for the non-delivery at San Francisco, by the ship, of certain quantities of merchandise shipped upon her at New York, to be delivered, at the former port, to the several libellants respectively, but which were sold in the course of the voyage by the master at Montevideo, to pay for repairs at that port, made necessary by the stranding of the ship at the Bay of San Antonio.

The answers to all the libels, except to that of Embury & Co., set up substantially that the stranding at the Bay of San Antonio took place under circumstances which made the damage, and all expenses consequent thereon, a subject

of general average contribution by the ship, freight, and cargo.

The libel of Embury et al. was for the alleged amount paid by them as the consignees of the ship at San Francisco, as the expenses of an average adjustment, made or attempted to be made by them at that port after her arrival, and of an attempted collection of the same.

To this last libel the claimant of the vessel demurred, on the ground that the matters alleged did not constitute a cause of contract within the admiralty jurisdiction. He then proceeded to deny the principal allegations of the libel, and set up that the adjustment in question was made by the libellants, on their own account, as the assignees of the charterers of the ship (Annan & Co.), and not on account of the ship or her owners, and was defective, erroneous, and worthless; that at all events the cost of the adjustment should come into the general average, and the ship be liable only for her share in the contribution. That the libellants having, as charterers and consignees of the ship, delivered the cargo to the several consignees thereof without collecting the average thereon, should bear the loss. That the average actually collected by them, and the sum of $30,000 balance remaining unpaid on the charter of the ship, should be set-off.

The court referred the case to a commissioner to report an adjustment, upon the assumption that the loss and expenses caused by the stranding of the ship were general average. He did so report. But in his report—

1. He charged the ship or freight with the expenses of the adjustment made at San Francisco, by Annan, Embury & Hazzard.

2. He assumed as the basis of his estimate of the contributory value of the ship her valuation in the policy of insurance at Boston, deducting what the repairs at Montevideo cost.

3. He brought into particular average, or subject to a deduction of "one-third new for old," certain expenses at Montevideo, which, though incidental to the repairs of the ship, were either not themselves a permanent benefit to her, or were not incurred for that purpose. Such as expenses of

1. Surveys, orders, estimates, reports, &c.

2. Preparations for making the repairs; labor in heaving her down; wear and tear of materials used therein; anchors, cordage, blocks, &c.; boat hire, &c.

3. Building staging and use of materials therein, &c.

4. Expenses of raising funds (*i. e.*, loss on sale of cargo), &c.

Upon the coming in of the report, exceptions were filed by both parties. By the libellants, on the ground mainly that the loss and expenses were not general average; by the claimant, upon grounds affecting the details, just mentioned, of the report.

Upon these exceptions and the case stated, the matter was argued before the District Court, which decided that the damage caused by the stranding of the ship, and the loss and expenses consequent thereon (including the cost of the repairs at Montevideo), was a subject of particular average, and not of general average, as contended on behalf of the ship; and held her liable, as contended for by the libellants. Its view apparently was, that to make the case one for general average, the stranding should have been the result of an intention to effect that particular object. That court also held the ship liable under the last of the libels, namely, that of Embury et al., for the expenses of the adjustment made by the consignees; and decreed accordingly. The Circuit Court affirmed the decree of the District Court.

Subsequently, and before the appeal to this court, it was discovered that a serious error had been committed in the amount inserted in the decree upon the first libel, $26,469. It had been stipulated between the parties, that from any sum found due to the libellants, Annan et al., in their libel, should be deducted $26,177.80, the balance due by them as the charterers of the ship, and the decree entered for the difference. But a small portion of this balance was in fact deducted, so that the decree, instead of being for $26,469, should have been but for $4291.13.

On behalf of the ship a motion was made to correct this error of figures. The court, however, refused to correct the

decree, on the ground of the great lapse of time since the entry of the decree in the District Court, and because the alleged error, if it existed, might be corrected on appeal in this court.

It appeared also that another large sum, about $14,000, which should have been deducted from the same judgment for averages received by the same libellants, was never deducted.

Both these errors of figures were attributable to the adjuster who made up the adjustment for Embury et al., and to whom the casting up of the amounts awarded in the decree had been subsequently committed by the ship's agent at San Francisco.

The case was now brought to this court on these grounds:

1. That the damage to the ship, caused by her stranding at the Bay of San Antonio, and the loss and expense consequent thereon, were a subject of general average, and not of particular average, as decided by the court below.

2. That even if this were not so, and they were a subject of particular average, then the exceptions to the commissioner's report should have been sustained.

3. That the error of figures in entering the decree in favor of Annan et al. should be corrected, by reducing the same to $4291.13.

*Mr. E. Casserly, for the appellant:*

The conditions which must concur to stamp on a maritime loss the character of a general average may be stated as follows:

1. The danger must be imminent, and common to the ship, cargo, and the lives of those on board.

2. To avert this danger from the whole, the ship or cargo, either entirely or in part, must be purposely exposed to risk in lieu of the whole.

3. By the loss incurred, the safety of the other interests involved must, at least for the time, be accomplished.

The only controversy here is, whether or no the *second* essential condition is found in the case. In other words,

whether, to avert the danger impending over the whole, the ship was purposely put at risk in lieu of the whole, so as to make the damage afterwards incurred by her (and, of course, the consequent expenses) matter of general average contribution.

The facts are agreed on. The question is as to the legal effect of them.

The two following propositions contain, we suppose, a just statement of the law which governs this case:

1. Whenever, to avoid an imminent danger, common to the ship, cargo, and the lives of those on board, the ship is voluntarily or purposely exposed to a distinct and extraordinary peril, out of the usual course of navigation, and of the ship's duties as a carrier for the voyage, any loss or damage to the ship consequent thereon is a subject of general average contribution.

2. It is immaterial though this loss or damage to the ship is other or greater than was expected, or whether it was wrought directly and immediately by the act of exposure, or incidentally by reason of the ship being placed in a situation which made her liable to the injury.

The two propositions may be discussed together.

The whole law of general average is a series of analogous equities drawn out from an original principle. There being no decided case precisely the same with this in its facts, it will be necessary to deduce the law of this case by the same process, aided by the decisions in analogous cases.

The most obvious general analogy to sustain both propositions is that of goods put into a lighter to relieve the ship and cargo, and afterwards lost or damaged. This is a case of general average as ancient as the Digest, and so by all the authorities since, without exception.

So in the highly analogous case of goods lightered out of a ship compelled to take refuge in a port to which she was not destined, and which she cannot enter without being relieved of a part of her cargo.

This latter case presents pointedly the feature which converts a loss of lightered goods into a general average, namely,

that the lightering is out of the usual course of navigation for the voyage. Where it is not so, as when the lightering is in the common course of navigation or business, the loss is particular average. The exception is fully recognized,[*] and confirms the rule, and both clearly establish our two propositions.

In all such cases the decisive fact is, that there is a voluntary exposure of the goods to a distinct and extraordinary peril, out of the common course of navigation. The intention in putting the goods into the lighters is not to destroy them. Very generally the expectation is that they will be saved. The loss, howsoever it occurs, is incidental to the exposure, and is general average.

Following out the same principle of an extraordinary exposure, Magens[†] mentions the case of goods put out of a leaky ship on board of another, which was afterwards captured, where the goods were contributed for in general average.

Besides lightered goods, Emerigon[‡] mentions the case of boats launched from a ship for the common safety and afterwards lost, coming into general average. As when a ship chased by hostile cruisers put out a boat with a lantern into the sea at night, by which the enemy was misled, and the ship escaped.

And see the cases of extraordinary exposure or loss, out of the common course, in 2 Phillips on Insurance: slipping the cable to run out to sea to escape going ashore;[§] sails let go to right the ship when on her beam-ends;[||] applying a portion of the ship's tackle or equipment to an extraordinary use;[¶] cutting a cable to keep with convoy or escape from an enemy;[**] expense of putting into a port out of the course of the voyage, to refit, &c., &c.[††]

Finally, in *Dupont* v. *Vance*,[‡‡] this court has stated the distinctive features of a general average sacrifice in these words:

---

[*] Emerigon, 474; 2 Phillips on Insurance, § 1288, and note 3; Stevens and Benecke, 134; Lewis v. Williams, 1 Hall, 437, 438.

[†] 1 Magens, 160, case ix, quoted by Stevens and Beneke, 134, note *a*.

[‡] Pp. 480, 481.        [§] § 1295.        [||] § 1298.        [¶] § 1299

[**] §§ 1308, 1309.        [††] § 1320.        [‡‡] 19 Howard, 162.

"If it be made to relieve the adventure from a peril which has fallen on all the subjects engaged in it, the risk of which peril was not assumed by the carrier, the charge is to be borne proportionably by all the interests," &c.

The doctrine which prevailed below seems to have been that, to entitle a loss to come into general average, it must be not only the direct, but the immediate result of the act and will of man; so that, if the loss be by stranding, stranding must have been the very form of injury premeditated in making the exposure or sacrifice. But this doctrine is at war with the first principles of general average; with many of the oldest and most widely acknowledged cases of general average; and with several decisions of recognized authority in the Federal courts. The vital principle of general average is the motive of the act of sacrifice or exposure. That motive must be the common safety of the other interests concerned. It is that which gives its character to the act; not the fact that any particular damage was intended, or form of damage or injury " premeditated."

The doctrine is moreover in conflict with the principle and reason of the oldest and clearest cases of general average. Such are : goods put into lighters to relieve the ship; goods lightered to enable the ship to enter a port not her port of destination; goods put out of a leaky ship into another which is afterwards captured, &c. In all these cases the forms of injury are manifold, and beyond all human power beforehand to particularize. Thus, lightered goods may be damaged by water from the sea or the sky, by cold or heat, or by lightning; may be lost by stranding or foundering, or jettison, or by capture. It is, therefore, quite impossible to say how far the damage done the goods is "the direct and immediate result" of the exposure, or is merely a consequence or incident of their being placed in a position which made them peculiarly liable to injury. Or, that the particular form of damage done could have been (in the language of the District Court) " the result of an intention to effect that particular object." That would be to require of every

master of a ship, besides being a mariner, to be also a prophet.

The doctrine is equally opposed to all the most authoritative cases in the United States.

In *Caze* v. *Reilly*,* a case the reasoning of which has twice received "the unqualified assent" of the Supreme Court of the United States,† the master of a schooner, hard pressed by British cruisers, ran her upon the beach at Long Branch. The enemy, landing in boats, set fire to the vessel and burned her to the water's edge. The hulk floated ashore and was lost. About half of the cargo was saved, part before she was set on fire, and part after the fire was extinguished. Two questions were raised as to the liability of the goods saved to a general average. *First,* for the value of the vessel; and, *second,* for that of the freight and cargo lost. The first— which, in fact, involves the other—was the only one argued and decided. The court held in favor of the general average for the value of the vessel.

So in *Sims* v. *Gurney*,‡ a case which, like *Caze* v. *Reilly*, has twice received the approval of the Supreme Court of the United States.† From the violence of the storm in the Delaware Bay the ship, in this case, had to go ashore somewhere, and was in danger, if left to herself, of going upon certain flats, where her situation would have been extremely perilous. The subsequent facts are stated by the court: (p. 527.)

" To prevent that, the course was altered, and they stood for Cape May, the most desirable place to run on shore. The captain wished to get to Cape May, and the pilot said he would try for it, although he did not expect to effect it, but supposed they would stick on a ridge about four miles from the Cape. On this ridge the ship struck, according to the pilot's expectations. She lost her rudder and labored very hard on the ridge; the mizzen and mainmast were cut away to save her, and at length, con-

---

* 3 Washington's Circuit Court, 298.

† Columbian Insurance Company *v.* Ashby, 13 Peters, 343; Barnard *v.* Adams, 10 Howard, 302

‡ 4 Binney, 513

trary to expectation, she beat over and got into deep water between the ridge and the Jersey shore. Being then quite ungovernable, she was at the mercy of the winds and currents, which, most fortunately and unaccountably, brought her on the shore near to Cape May, the object of their wishes. The damage was very considerable, both on the ridge and at the Cape, and in the course of the argument the damage at these two places has been the subject of separate consideration."

It was held a case of general average, both as to the damage from striking on the ridge and as to that from stranding on the beach at Cape May.

"'Because,' says the court, ' the damage at Cape May was the necessary result of running on the ridge. The ship lost her rudder and masts on the ridge, in consequence of which she was driven by the winds and waves on the shore near the cape. The same reasoning applies to the boats. For it was left to the jury to decide whether the damage done to them was in consequence of running on the ridge.' "

The first damage was by striking on the ridge four miles from Cape May, and was expected. The subsequent damage done by the loss of her boats and her stranding on Cape May was not only not expected, nor the result of an intention to effect that particular object, but was contrary to the expectations of the ship's officers. It was, however, a consequence of the original act of exposure, and partook of its character, because it was produced subsequently, by placing her in a situation which made her peculiarly liable to damage: namely, running her on the ridge, where she beat till she lost two of her masts and her rudder, and became unmanageable.*

The better doctrine is to treat all the facts connected with or consequent upon the original fact of exposure as one se-

---

* And see Sturgess v. Cary, 2 Curtis, 59, 66, 67; Reynolds v. Ocean Insurance Co., 22 Pickering, 191; Gray v. Waln, 2 Sergeant & Rawle, 229; Maggrath v. Church, 1 Caines, 196; Hennen v. Munro, 16 Martin's Louisiana, 449; also a case in the French Court of Aix Code de Commerce, Rogron's edition, note to Article 403.

ries: by reason of what a late writer calls the "oneness" of an act of general average.*

II. Was the stranding of the ship such as to make the loss occasioned thereby a subject of general average, within the rule laid down?

That this inquiry must be answered in the affirmative seems sufficiently clear.

How is it possible, on the case stated, to deny that there was an exposure, by the master, of his ship, to a distinct and extraordinary peril, purposely made by him, as the only escape from the instant destruction impending over ship, cargo, and crew?

The stranding is voluntary whenever the act of man in any degree concurs with the *vis major* to produce the result.†

The statement is, that "stranding was one of the chief risks he had assumed in attempting to run in." The other facts show conclusively that he realized this danger fully. They show that with his ship surrounded by the most pressing dangers, so thoroughly did he appreciate the perils of entering, and so reluctant was he to encounter them, that for three hours he held on outside, waiting for a pilot. A more pregnant fact it would be difficult to imagine. When, at last, he made up his mind to attempt to run in at all hazards, it was not because he overlooked or underrated the perils of the enterprise; but because it offered the only chance of escape from the far greater dangers that surrounded him, and which had become too pressing for further delay; and because, as the agreed statement says, "he preferred all the risks of running in to those of remaining outside." So stern was the necessity, that even though he knew the water was shoaling rapidly under him, the lead showing successively eight, seven, six, five, four and a half, and four fathoms, he dared not desist from the attempt to make his way in. The next moment, as must have been

---

* Hopkins's Average, 82, and cases cited.

† Emerigon (Meredith), 324, 475; Arnold on Insurance, 785–6 (Eng. ed. 1866), and note 1, p. 786; 4 Boulay Paty, 455, 457, 478.

expected, the ship grounded, and after striking heavily, remained fast.

In the face of these facts it seems little to the purpose to urge that the particular reef on which the ship struck was unknown to the master, that he endeavored to get a pilot, or even that he hoped or expected to take her safely in.

The theory of the court below was that to constitute a general average loss there must be an intent recklessly to destroy the thing selected for the exposure; a determination to sacrifice it at all events, without regard to the ordinary means of safety.

In truth, the intention to injure the *jactus*, as distinguished from the intention to put it in a situation of exposure out of the usual course, much less to injure it in any particular manner, or by any particular rock or shoal, *cannot* be an element of general average. Otherwise, goods lightered would never be entitled to contribution; because, as to them (as already remarked), so far from there being any intention to injure them, the expectation commonly is that they will be saved.*

So there is nothing in the fact that the captain tried to get a pilot. Having determined on the effort to take his ship in, it was his duty to do so, safely, if he could; and the law of general average neither requires nor allows any wanton exposure of property, or reckless disregard of the ordinary precautions. Neither does it object that the master obtains safety for the rest, at the least possible risk to the thing exposed.†

It is sufficient if there is a purpose to subject the *jactus* to a distinct and extraordinary exposure in lieu of the rest. That having been the master's purpose in this case, it is immaterial how far he hoped or endeavored to take his ship in without serious injury. His purpose and intention were to

---

* Caze v. Reilly, *supra*, 214.

† Barnard v. Adams, 10 Howard, 270; Sims v. Gurney, 4 Binney, 513, 514, 515, 519; Mutual Insurance Co. v. Cargo of Ship George, Olcott, 89, 91, 92; Columbia Insurance Company v Ashby, 13 Peters, 342; Emerigon, 324 (ch 12, ? 13).

attempt to take her in at all hazards; and this purpose and intention embraced all the consequences of the attempt. He may have hoped they would not be serious, and may have taken every precaution to that end; and he may not have had beforehand a very definite idea of their precise character. But, whatever they might be, he deliberately exposed his ship to them. When one of them proved to be stranding, that result took its character from the act whence it flowed. That having been voluntary and with a purpose, the stranding was, in the eye of the law, voluntary also. The master's efforts, or even his hopes to take his ship in safely, as they could not control the event, do not affect its character.

The only remaining inquiry is—

III. Was the risk taken in this case out of the usual course of navigation and of the ship's duties as a carrier for the voyage, so as to entitle the loss consequent thereon to come into general average?

The place into which the master of the Star of Hope was obliged to venture with her, as his only chance of escape, was not his destined or any port, but a wild and desolate bay, far from the paths of commerce and forsaken by man, with a depth of water palpably dangerous and insufficient. The attempt to take her into such a place at all was not only beyond his duty, but could not be justified except by circumstances so desperate as to leave no alternative between that and destruction. The same circumstances inspired the motive which gives to the attempt, and to its consequences, the character which we claim for them.

The circumstances of the present case illustrate forcibly this important distinction between it and the cases put by the district judge.

If, after the deviation of the ship, while making for a port of refuge, she had encountered an ordinary peril of the seas, or one which, however extraordinary, was casual and wholly unanticipated, and without the choice or agency of man, in neither instance would the loss be general average. In the former instance the loss is one of the ordinary incidents of navigation; in the latter it lacks the essential element of an

exposure made or a risk run by man's agency with a purpose, and that purpose the common safety from a known danger.

But in the moment when the determination to take his ship into an unknown bay, at whatever risk, was acted on by the master, a new exposure of the ship was made, wholly different in its character; an exposure to distinct perils, made with a purpose of rescuing all the interests from a common danger; an exposure which was the voluntary sacrifice of the ship, so far as the mind and agency of man were concerned, or as respected any consequences that might ensue.*

IV. [The counsel then directed his argument to the exceptions to the commissioner's report.]

*Mr. Donahue, contra:*

To make a loss or damage by stranding a subject of general average, the stranding must be voluntarily or purposely done.

The question then presented, as applied to the circumstances of the case at bar, is this: Is the accidental stranding of a vessel to be deemed a voluntary or intentional stranding within the meaning of the law, when it appears that the stranding was either directly or incidentally occasioned by the intentional exposure of the vessel to extraordinary perils, out of the usual course of navigation and of the ship's duties as a common carrier?

The principles established by different cases cited on the other side, such as *Caze* v. *Reilly*,† *Columbian Insurance Company* v. *Ashby*,‡ *Sims* v. *Gurney*,§ *Gray* v. *Waln*,‖ seem to be

1. That the intention to consign to inevitable loss the objects (whether the goods or the ship) which are selected to bear the burden of the risk forms no element of the right to contribution. This principle is expressly declared by the

---

* Lee *v.* Grinnell, 5 Duer, 415, 416.

† 3 Washington's Circuit Court, 298.　‡ 13 Peters, 331.

§ 4 Binney, 513.　　‖ 2 Sergeant & Rawle, 229.

Supreme Court in *Barnard* v. *Adams*,* and will not be denied in the present case.

2. It is also decided in these cases, that where a ship has been voluntarily stranded, the circumstance that she is thereby lost strengthens rather than destroys her claim for contribution against the cargo saved by the sacrifice.

3. That though the vessel may have been in the most imminent danger of being stranded by the force of the elements, yet, if the actual stranding is the immediate result of human agency, and is different from the one impending, and effected for the common safety, the case is one for general average.

But in all these cases the actual stranding as it occurred was intentional. The doubt arose from the fact that a stranding of some kind was imminent, if not inevitable, and that the volition of the master was exercised merely in the selection of a less dangerous part of the shore whereon to strand his ship.

But in the case at bar it was no part of the master's intention to strand the vessel. The stranding was not only involuntary but unexpected, except so far as he was aware that in attempting to run into an unknown harbor he incurred that risk, amongst others, and that it was the chief risk he encountered. That he voluntarily subjected the vessel and cargo to whatever risks such a course involved cannot be doubted, but it is equally clear that he did not voluntarily and intentionally strand his vessel, that is, that the stranding was not the immediate and direct result of an intention to effect that particular object.

It may be said that the whole deviation to a port of distress, and especially the entering this port, was a sacrifice for the common safety. But if an accidental damage of this kind is to be allowed in general average, because it occurred during a voluntary deviation, rendered necessary by a *vis major*, and therefore is the effect and consequence of a sacrifice for the common safety, the same principle would require

* 10 Howard, 304.

that every loss incurred during such a deviation should be contributed for.

Every peril encountered during a deviation is encountered out of the usual course of navigation for the voyage, and might, in a certain sense, be said to be the consequence and effect of a sacrifice made for the common safety. Thus, if the damage consequent upon the voluntary exposure to the dangers of entering an unknown harbor be general average, by parity of reasoning losses arising from directing the ship to parts of the seas where the chances of collision are greatly increased, or to high latitudes, where the risks of damage from icebergs are enhanced, or to stormy and inhospitable coasts, where the damages of shipwreck might be far greater than if the regular and usual course of the voyage had been pursued, might also be contributed; for the practical results of the principle contended for would be, that in all cases of deviation all the interests would be bound to contribute, or would become the insurers against any accidental damage sustained by any one of them.

If it be said that the risk incurred in entering an unknown and unfrequented harbor was extraordinary, we answer:

1. That in the cases supposed, and in many others, the risks incurred in consequence of a deviation may be quite as great and as much out of the usual course of navigation for the voyage as those incurred by the Star of Hope.

2. That it would be impracticable for courts to make the determination of the right to contribution depend upon nice discriminations between different degrees of peril, or to attempt to decide in each case whether the carrier was or was not bound, by his contract, to expose his vessel to the precise degree of risk he encountered; and,

3. That it is better to establish on such a subject a clear and well-defined rule, susceptible of general application, than to make the decision depend upon uncertain estimates of the degree of risk encountered, and thus give rise to many unfounded claims and to incessant litigation.

Independently of what precedes, which is in fact the argument of the court below, we submit that the ship should

bear the loss, because by an express contract,—that namely of the charter-party,—the owner of the vessel expressly undertook to keep the vessel at his own expense in the condition in which she ought to be. The charter made no exception.

On the whole case the ship should bear the loss.

*Reply :* To the point, taken here for the first time, that the charter-party bound the owners to keep the ship staunch, well-fitted, &c., for the voyage, the answer is : That this covenant is no more than the law would imply without express words, and is subject to the understood exception of the perils of the seas.*

Mr. Justice CLIFFORD delivered the opinion of the court.

These are appeals in admiralty, brought here by the claimants of the ship Star of Hope, from a decree of the Circuit Court, rendered on appeal from a decree of the District Court, in four suits *in rem* instituted against the ship in the latter court, three being for the non-performance of a contract of affreightment, and the other for services rendered, and liabilities and expenses incurred, as consignees of the vessel. Twelve other suits were also instituted against the ship by other shippers for the non-delivery of their respective shipments, in which no appeals were taken, as the amount in controversy in the several cases was less than two thousand dollars.

1. Reference to one of the libels for the non-performance of the affreightment contract will be sufficient, as they all contain substantially the same allegations. Take the first one, for example, which was filed by the charterers. They describe the intended voyage as one from the port of New York to the port of San Francisco; they also allege that the goods were shipped on board the vessel; that she sailed on the tenth of February, 1856, from the port of shipment; that on the eighteenth of April following, in entering or attempting to enter the port of San Antonio, she accidentally

---

* The Casco, Davies, 185, 186, 187; Ames *v.* Belden, 17 Barbour 513.

Case restated in the opinion.

grounded or stranded upon a bank or shoal there situated; that she thereby received such injuries that she was obliged, in order that she might be able to continue the voyage, to put back to Montevideo for repairs; that the master, after the vessel arrived there, being without money, credit, or other means to execute the repairs, sold a valuable portion of the goods shipped by and belonging to the libellants, of the value of forty-four thousand seven hundred dollars, and with the proceeds thereof paid for the said repairs; that the repairs having been thus made the ship resumed her voyage, and arrived safely at her port of destination; that by reason of the sale of their goods the libellants lost the whole amount sold, and that the master and owners of the ship neglect and refuse to make restitution.

2. Prior to the filing of the answer the fifteen affreightment suits were consolidated, and leave was given to the claimants of the ship to file one general answer to all those libels, and also to file one general stipulation therein for costs and expenses.

Pursuant to that leave the claimants filed their answer, in which they allege that the injury and damage to the ship at the Bay of San Antonio were incurred by the master voluntarily and deliberately for the general safety, and especially for the safety of the cargo and the lives of those on board, and that consequently all loss and damage sustained by the ship at that bay, and all costs and expenses of the subsequent repairs, and all other necessary costs and expenses incurred while at Montevideo and in getting to sea again, together with the costs and expenses incurred for the wages and provisions of the master, officers, and crew, to the time when the ship resumed her voyage, are, of right and according to law, a subject of general average contribution, to be borne by the ship, her freight, and her cargo, and also by the owners thereof in their just proportions. They also allege that the goods of the libellants having been sold by necessity to execute the repairs, are, of right, to be included in the general average, together with all loss and damage to the libellants in consequence of the sale at the port of distress.

3. Brief reference must also be made to the libel filed by the consignees of the ship, as the fourth appeal under consideration is from that part of the decree relating to that suit. Annexed to the libel is a schedule setting forth the particular expenses and liabilities incurred for which the suit is brought, and the appellants, in response to that claim, allege, in the answer, that if any such disbursements were made, or any such expenses or liabilities were incurred, as is therein supposed, the same are a portion of the general average upon the ship, her freight, and cargo, to be borne by them all ratably, as alleged in the answer to the other libels.

Both parties consenting, the cause was referred to a commissioner to take and state an account and adjustment, upon the basis that the damage, loss, and expenses incurred by the ship are a subject of general average contribution, as contended by the claimants. Subsequent to that order, and before the hearing, the parties filed the agreed statement of facts set forth in the record. Although filed subsequent to the order of reference, still it is quite evident that it was drawn up and agreed to prior to the order, as one of the conditions of the order is that it shall not affect prejudicially the agreements of the parties as contained in the agreed statement.

Other evidence was introduced in addition to what is contained in the agreed statement, and the commissioner having heard the parties reported his conclusion in writing to the court, as directed in the order of reference. Exceptions to the report were duly taken by both parties, and they were again heard in support of the same; but the court being of the opinion that the damage, loss, and expenses incurred by the ship, as described in the answer and in the agreed statement, are not the proper subject of general average contribution, sustained the exceptions filed by the libellants, over ruled those filed by the claimants, and entered the decree set forth in the transcript. Appeal was taken by the claimants from that decree to the Circuit Court, where the decree of the District Court was in all things affirmed. Dissatisfied

with the decree as affirmed, the claimants appealed to this court, and still insist that the damage, loss, and expenses incurred by the ship are the proper subject of general average between the ship, her cargo, and freight, as alleged in the answer, which is the principal question presented for decision.

4. Much less difficulty will attend the solution of the question than is usual in cases of this description, as all the facts material to be considered in deciding the case are set forth in the agreed statement signed by the counsel of the respective parties.

Part of the cargo was furnished by the charterers, but large quantities of goods were also shipped by the libellants in the other libels, numbered from two to fifteen inclusive, and the owners of the ship also, by the consent of the charterers, shipped two hundred and forty-four and a half tons of coal on their own account. They were not interested in the other shipments, nor is it necessary to describe the goods composing the residue of the cargo, except to say that among the merchandise shipped were five hundred casks and packages of spirituous liquors, and forty or fifty kegs of gunpowder, prepared as "patent safety fuses," and the agreed statement shows that the spirituous liquors were stowed next to the coal shipped by the owners.

With a full cargo on board, the ship sailed for her port of destination on the day alleged in the pleadings, and during the voyage, to wit, on the fourteenth of April following, it was discovered that great quantities of smoke and vapor were issuing from the fore and after hatches of the ship. She was proceeding on her voyage, at the time the discovery was made, in latitude forty-six degrees south, longitude fifty-three degrees west, but the weather was squally and the sea was rough. Precautions, such as are usual on such occasions, were immediately adopted: the hatches were fastened down, and "everything made tight," in order to check as much as possible the progress of the fire, at least until a port of succor could be reached.

Great alarm was felt, and the fears of all were much in-

creased by the fact, well known to all, that the cargo contained prepared gunpowder and large quantities of spirituous liquors. Under the circumstances the crew refused to continue the voyage, and the master determined, very properly, as the parties agree, to make for the Bay of San Antonio, on the southeast coast of Patagonia, as the nearest anchorage, and at the end of four days the ship arrived off that bay, and set the usual signal for a pilot.

Throughout that period the signs of fire continued to increase, and in getting up the chains, so as to be ready to cast anchor without delay, they were found to be quite hot, and there were other indications of fire, which greatly heightened the general alarm. Unwilling to run into a bay, unknown to him, without a pilot, the master set his signal as aforesaid and waited three hours for one, but no one came, and it became evident that none could be expected, as the coast was wild and desolate.

Something must be done, as the alarm increased as the impending peril became more imminent. Haul off the master could not, as the wind and waves were against any such movement. He could not resume the voyage for the same reason, and also because the crew utterly refused their cooperation; nor could he with safety any longer attempt to "lie to," as the ship was gradually approaching the shore, and because she was exposed both to the impending peril of fire on board, and to the danger, scarcely less imminent, of shipwreck from the wind and waves. Nothing, therefore, remained for the master to do, which it was within his power to accomplish, but to run the vessel ashore, which it is agreed by the parties would have resulted in the "certain and almost instant loss of vessel, cargo, and all on board," or to make the attempt to run into the bay without the assistance of a pilot. Evidently he would have been faithless to every interest committed to his charge if he had attempted to beach the vessel at that time and place, as the agreed statement shows that the weather was rough, that the wind was high and blowing towards the land with a heavy sea, and that the shore was rocky and precipitous.

What the master did on the occasion is well described by the parties in the agreed statement, in which they say he at length determined, as the best thing to be done for the general safety, and especially for the preservation of the cargo and the lives of those on board, to make the attempt to run in without a pilot, preferring all risks to be thereby incurred rather than to remain outside in the momentary apprehension of destruction to all, and the parties agree that he was fully justified in his decision as tested by all the circumstances, although the ship in attempting to enter the bay grounded on a reef, and before she could be got to sea again sprung aleak and sustained very serious injuries in her bottom.

Great success, however, attended the movement, notwithstanding those injuries, as the water taken in by the ship extinguished the fire, and the ship remained fast and secure from shipwreck until the winds subsided and the sea became calm.

Repairs could not be made at that place, and the parties agree that the injuries to the ship were such as fully justified the master in returning to Montevideo for that purpose, as that was the nearest port where the repairs could be made. He arrived there on the twenty-seventh of the same month, and it appears by the agreed statement that the just and necessary expenses incurred by the ship at that port to enable her to resume the voyage were one hundred thousand dollars, including repairs, unloading, warehousing, and reloading of the cargo, and that the master, being without funds or credit, was obliged to sell a considerable portion of the cargo to defray those expenses.

Repaired and rendered seaworthy by those means the ship, on the eleventh of September, in the same year, resumed her voyage and arrived at her port of destination on the seventh of December following, and the master, without unnecessary delay, delivered the residue of the shipments in good order to the respective consignees, as required by the contract of affreightment.

5. General average contribution is defined to be a contribution by all the parties in a sea adventure to make good the loss sustained by one of their number on account of sacrifices voluntarily made of part of the ship or cargo to save the residue and the lives of those on board from an impending peril, or for extraordinary expenses necessarily incurred by one or more of the parties for the general benefit of all the interests embarked in the enterprise. Losses which give a claim to general average are usually divided into two great classes: (1.) Those which arise from sacrifices of part of the ship or part of the cargo, purposely made in order to save the whole adventure from perishing. (2.) Those which arise out of extraordinary expenses incurred for the joint benefit of ship and cargo.*

Common justice dictates that where two or more parties are engaged in the same sea risk, and one of them, in a moment of imminent peril, makes a sacrifice to avoid the impending danger or incurs extraordinary expenses to promote the general safety, the loss or expenses so incurred shall be assessed upon all in proportion to the share of each in the adventure.†

Where expenses are incurred or sacrifices made on account of the ship, freight, and cargo, by the owner of either, the owners of the other interests are bound to make contribution in the proportion of the value of their several interests, but in order to constitute a basis for such a claim it must appear that the expenses or sacrifices were occasioned by an apparently imminent peril; that they were of an extraordinary character; that they were voluntarily made with a view to the general safety; and that they accomplished or aided at least in the accomplishment of that purpose.‡

Authorities may be found which attempt to qualify this rule, and assert that where the situation of the ship was such that the whole adventure would certainly and unavoid-

---

* 2 Arnould on Insurance, 770; McAndrews v. Thatcher, 3 Wallace, 365

† 2 Parsons on Insurance, 210; Ib. 277; 1 Parsons on Shipping, 346 McAndrews v. Thatcher, 3 Wallace, 366.

‡ 2 Phillips on Insurance, 61.

ably have been lost if the sacrifice in question had not been made, the party making it cannot claim to be compensated by the other interests, because it is said that a thing cannot be regarded as having been sacrificed which had already ceased to have any value, but the correctness of the position cannot be admitted unless it appears that the thing itself for which contribution is claimed was so situated that it could not possibly have been saved, and that its sacrifice did not contribute to the safety of the crew, ship, or cargo. Sacrifices, where there is no peril, present no claim for contribution, but the greater and more imminent the peril the more meritorious the claim for such contribution, if the sacrifice was voluntary and contributed to save the associated interests from the impending danger to which the same were exposed.*

Such claims have their foundation in equity, and rest upon the doctrine that whatever is sacrificed for the common benefit of the associated interests shall be made good by all the interests which were exposed to the common peril and which were saved from the common danger by the sacrifice. Much is deferred in such an emergency to the judgment and decision of the master; but the authorities, everywhere, agree that three things must concur in order to constitute a valid claim for general average contribution: First, there must be a common danger to which the ship, cargo, and crew were all exposed, and that danger must be imminent and apparently inevitable, except by incurring a loss of a portion of the associated interests to save the remainder. Secondly, there must be the voluntary sacrifice of a part for the benefit of the whole, as for example a voluntary jettison or casting away of some portion of the associated interests for the purpose of avoiding the common peril, or a voluntary transfer of the common peril from the whole to a particular portion of those interests. Thirdly, the attempt so made to avoid the common peril to which all those interests were exposed

---

* Maude & Pollock on Shipping, 320; MacLachlan on Shipping, 356; Barnard v. Adams, 10 Howard, 270.

must be to some practical extent successful, for if nothing is saved there cannot be any such contribution in any case.*

Equity requires, says Emerigon, that in these cases those whose effects have been preserved by the loss of the merchandise of others shall contribute to this damage, and commercial policy as well as equity favors the principle of contribution, as it encourages the owner, if present, to consent that his property, or some portion of it, may be cast away or exposed to peculiar and special danger to save the associated interests and the lives of those on board from impending destruction; and if not present, the moral tendency of the well-known commercial usage is to induce the master to exercise an independent judgment in the emergency for the benefit of all concerned.†

Masters are often compelled, in the performance of their duties, to choose between the probable consequences of imminent perils threatening the loss of the ship, cargo, and all on board, and a sacrifice of some portion of the associated interests in their custody and under their control, as the only means of averting the dangers of the impending peril in their power to employ. They must elect in such an emergency, and if they, in the exercise of their best skill and judgment, decide that it is their duty to lighten the ship, cut away the masts, or to strand the vessel, courts of justice are not inclined to overrule their determinations.

Owners of vessels are under obligation to employ masters of reasonable skill and judgment in the performance of their duties, but they do not contract that they shall possess such qualities in an extraordinary degree, nor that they shall do in any given emergency what, after the event, others may think would have been best. From the necessity of the case the law imposes upon the master the duty, and clothes him with the power, to judge and determine, at the time, whether the circumstances of danger in such a case are or are not so great and pressing as to render a sacrifice of a

---

* Barnard v. Adams, 10 Howard, 303; Patten v. Darling, 1 Clifford, 262; 2 Parsons on Insurance, 278.

† Emerigon, 467.

portion of the associated interests indispensable for the common safety of the remainder. Standing upon the deck of the vessel, with a full knowledge of her strength and condition, and of the state of the elements which threaten a common destruction, he can best decide in the emergency what the necessities of the moment require to save the lives of those on board and the property intrusted to his care, and if he is a competent master, if an emergency actually existed calling for a decision whether such sacrifice was required, and if he appears to have arrived at his conclusion with due deliberation, by a fair exercise of his own skill and judgment, with no unreasonable timidity, and with an honest intent to do his duty, it must be presumed, in the absence of proof to the contrary, that his decision was wisely and properly made.*

Controversies respecting the allowance or adjustment of general average more frequently arise in cases where the sacrifice made consisted of a jettison of a portion of the cargo than in respect to any other disaster in navigation.†

Explanations and illustrations upon the subject, therefore, whether found in treatises or in judicial decisions, are usually more particularly applicable to cases of that description than to a case where the vessel was stranded, but the leading principles of law by which the rights of parties are to be ascertained and determined in such cases are the same whether the sacrifice made consisted of a part of the cargo or of a part or the whole of the ship, as the controlling rule is, that what is given for the general benefit of all shall be made good by the contribution of all, which is the germ and substance of all the law upon the subject.

Doubts at one time were entertained whether a loss occasioned by a voluntary stranding of the vessel, even though it was made for the general safety, and to avoid the probable consequences of an imminent peril to the whole adventure, was the proper subject of general average contribution, but

* Lawrence v. Minturn, 17 Howard, 110; Dupont v. Vance, 19 Howard, 166; Patten v. Darling, 1 Clifford, 264.

† Birkley v. Presgrave, 1 East, 227.

those doubts have long since been dissipated in most juris-dictions, and they have no place whatever in the jurisprudence of the United States.

Where the ship is voluntarily run ashore to avoid capture, foundering, or shipwreck, and she is afterwards recovered so as to be able to perform her voyage, the loss resulting from the stranding, says Mr. Arnould, is to be made good by general average contribution, and the writer adds that there is no rule more clearly established than this by the uniform course of maritime law and usage.*

Sustained as that proposition is at the present day by universal consent, it does not seem to be necessary to refer to other authorities in its support, nor is it necessary to enlarge that rule in order to dispose of the present controversy, but to prevent any misconception as to the views of the court it is deemed proper to add that it is settled law in this court that the case is one for general average, although the ship was totally lost, if the stranding was voluntary and was designed for the common safety, and it appears that the act of stranding resulted in saving the cargo.†

Undoubtedly the sacrifice must be voluntary and must have been intended as a means of saving the remaining property of the adventure, and the lives of those on board, and unless such was the purpose of the act it gives no claim for contribution, but it is not necessary that there should have been any intention to destroy the thing or things cast away, as no such intention is ever supposed to exist. On the contrary it is sufficient that the property was selected to suffer the common peril in the place of the whole of the associated interests, that the remainder might be saved.‡

6. Suggestion is made that the act of stranding of the vessel in this case was not a voluntary act, as the reef where

---

* 2 Arnould on Insurance, 784; Lewis *v.* Williams, 1 Hall, 440.

† Columbian Insurance Company *v.* Ashby, 13 Peters, 331 ; Caze *v.* Reilly, 8 Washington's Circuit Court, 298 ; Sims *v.* Gurney, 4 Binney, 513 ; Gray *v.* Waln, 2 S. & R. 229; 1 Parsons on Shipping, 372; Merithew *v.* Sampson, 4 Allen, 192.

‡ 1 Parsons on Shipping, 348.

she grounded was not visible at the time and was unknown
to the master, but the agreed statement shows that in under-
taking to run into the bay the master knew that the chief
risk he had to encounter was the stranding of the ship, and
the precautions which he took to guard against that danger
show to the entire satisfaction of the court that the disaster
was not altogether unexpected.   As the ship advanced the
lead was constantly employed, showing eight fathoms at
first, then seven, then six only, and so on, the depth con-
tinuing to diminish at each throw of the lead until the ship
grounded and remained fast.

Grant that the master did not intend that the ship should
ground on that reef, still it is clear that he was aware that
such a danger was the chief one he had to encounter in en-
tering the bay, and the case shows that he deliberately elected
and decided to take that hazard rather than to remain out-
side, where, in his judgment, the whole interests under his
control, and the lives of all on board were exposed to immi-
nent peril if not to certain destruction.   Under these cir-
cumstances it is not possible to decide that the will of man
did not in some degree contribute to the stranding of the
ship, which is all that is required to constitute the stranding
a voluntary act within the meaning of the commercial law.*

Suppose the storm outside the bay was irresistible and
overpowering, still it does not follow that there was no exer-
cise of judgment, for there may be a choice of perils when
there is no possibility of perfect safety.†

Destruction of all the interests was apparently certain if
the ship remained outside, but the master under the circum-
stances elected to enter the bay, without the assistance of a
pilot, knowing that there was great danger that the ship
might ground in the attempt, but his decision was, that it
was better for all concerned to make the attempt than to re-
main where he was, even if she did ground, and the result
shows that he decided wisely for all interests, as damage re-

---

* 2 Arnould on Insurance, 785; Emerigon, 324

† Sims *v.* Gurney, 4 Binney, 525; 2 Parsons on Contracts (5th ed.), 325,
and note *y*.

sulted to none except to the ship, and she would doubtless have been destroyed if she had continued to remain outside of the bay.*

Guided by these considerations our conclusion is, that the loss and damage sustained by the ship at the place of the disaster, and the costs and expenses of the repairs, and all the other costs and expenses as charged in the adjustment, are the proper subject of general average contribution, as alleged by the claimants in their answer.

Details will be avoided, as the decree must be reversed and the cause remanded for further proceedings.

7. Apart from the error in the principle of the decree there is a manifest error in the amount allowed in the first case, but inasmuch as there must be a new hearing and a new decree, the correction of the error can best be made in the Circuit Court.

Brief consideration must also be given to the exceptions, taken by the claimants, to the report of the commissioner, which were overruled by the court. They are three in number, and they will be considered in the order in which they were made.

i. That the commissioner erred in charging the ship or freight with any part of the expenses incurred by the charterers in the *ex parte* adjustment procured by them prior to the order of reference to the commissioner.

Unusual difficulty attends the inquiry, on account of the indefinite character of the exception and the uncertain state of the evidence, but the conclusion of the court being that the case is one for general average, it seems to the court that those expenses constitute a matter to be adjusted between the charterers and the libellants irrespective of the controversy presented in this record, unless the results of that adjustment were adopted and used by the commissioner. Influenced by these suggestions the exception is sustained, but the matter is left open for further inquiry when the mandate is sent down.

---

* Rea *v.* Cutler, 1 Sprague, 136.

ii. That the commissioner erred in assuming that the valuation of the ship as given in the policy of insurance is the proper basis of her contributory value in the statement of the amount for general average.

As a general rule, the value of the ship for contribution, where she has received no extraordinary injuries during the voyage, and has not been repaired on that account, is her value at the time of her arrival at the termination of the voyage, but if she met with damage before she arrived, by perils of the sea, and had been repaired, then the value to be assumed in the adjustment is her worth before such repairs were made. Neither party gave any evidence as to the value of the ship prior to the disaster except what appears in the policy of insurance, and under the circumstances it is difficult to see what better rule can be prescribed than that adopted by the commissioner.*

Strictly speaking the rule is the value of the ship antecedent to the injuries received, but as that requirement can seldom be met the usual resort is her value at the port of departure, making such deduction for deterioration as appears to be just and reasonable.†

No proofs on that subject, except the policy of insurance, was offered by either party, and inasmuch as ships are seldom insured beyond their actual value the exception is overruled.

iii. That the commissioner erred in carrying into particular average certain expenses incurred by the master at the port where the repairs were made, which should have been regarded as the proper subject of general average.

Considerable difficulty also attends this inquiry for the want of a more definite statement of the grounds of the complaint. We think it plain, however, that the exception must be sustained, as some of the matters charged as particular average, in whole or in part, ought clearly to have been in-

---

* Hopkins on Average (3d ed.), 104; 2 Arnould on Insurance, 812; Patapsco Insurance Co. v. Southgate, 5 Peters, 604; Clark v. United States Insurance Co., 7 Massachusetts, 370; Dodge v. Union Insurance Co., 17 Id. 471.

† 1 Parsons on Shipping, 448; Mutual Safety Insurance Co. v. The Ship George, Olcott, Rep. 157.

cluded at their full value among the incidental expenses necessarily incurred in making the repairs, but in view of the circumstances we shall not attempt to do more than to state the general principles which should regulate the adjustment in the particulars involved in the exception, and leave their application to be made in the case by the court below, where the parties, if need be, may again be heard.

8. Whatever the nature of the injury to the ship may be, and whether it arose from the act of the master in voluntarily sacrificing a part of it or in voluntarily stranding the vessel, the wages and provisions of the master, officers, and crew from the time of putting away for the port of succor, and every expense necessarily incurred during the detention for the benefit of all concerned, are general average.*

Repairs necessary to remove the inability of the ship to proceed on her voyage are now regarded everywhere as the proper subject of general average. Expenses for repairs beyond what is reasonably necessary for that purpose are not so regarded, but it is not necessary to examine the exceptions to the rule with any particularity in this case, as the parties agree that all the expenses incurred were necessary to enable the ship to resume her voyage.

The wages and provisions of the master, officers, and crew are general average from the time the disaster occurs until the ship resumes her voyage, if proper diligence is employed in making the repairs.†

Towing the ship into port, and extra expenses necessarily incurred in pumping to keep her afloat until the leaks can be stopped, are to be included in the adjustment.‡

Surveys, port charges, the hire of anchors, cables, boats, and other necessary apparatus, for temporary purposes in making the repairs, are all to be taken into the account as

---

* Abbott on Shipping, 601; Plummer v. Wildman, 3 Maule & Selwyn, 482; Walden v. Le Roy, 2 Caines, 262; Henshaw v. Insurance Co., 1b. 274; Nelson v. Belmont, 21 New York, 38; The Brig Mary, 1 Sprague, 18.

† Padelford v. Boardman, 4 Massachusetts, 548; Potter v. Ocean Insurance Co., 3 Sumner, 27.

‡ 2 Phillips on Insurance (3d ed.), § 1326; Orrok v. Commonwealth Insurance Co., 21 Pickering, 469.

well as the expenses of unloading, warehousing, and reloading the cargo after the repairs are completed.*

Repairs in such a case cannot be made by the master unless he has means or credit, and if he has neither, and his situation is such that he cannot communicate with the owners, he may sell a part of the cargo for that purpose if it is necessary for him to do so in order to raise the means to make the repairs. Sacrifices made to raise such means are the subject of general average, and the rule is the same whether the sacrifice was made by a sale of a part of the cargo or by the payment of marine interest.†

Governed by these rules it is believed the rights of the parties may be adjusted without serious difficulty or danger of mistake.

DECREE REVERSED in respect to each of the four cases before the court.

---

* Potter v. Ocean Insurance Co., 3 Sumner, 42; The Brig Mary, 1 Sprague, 18; Stevens & Benecke, 76.

† Orrok v. Commonwealth Insurance Co., 21 Pickering, 469, 1 Parsons on Shipping, 400.