## THE MARGARETHE BLANCA.*

### (District Court, E. D. Pennsylvania. May 29, 1882.)

1. ADMIRALTY — GENERAL AVERAGE — SACRIFICE OF PROPERTY ALREADY INJURED.

Where property that has been displaced by a storm, although valuable and capable of being saved if the storm abates, is, from its position, an especial source of danger to the vessel, its sacrifice in order to save the vessel is a voluntary sacrifice, and its loss the subject of general average.

2. SAME.

The test in such cases is whether there was a reasonable chance of saving the property but for the continuance of the storm. If there was it was not lost, and the casting away of this chance for the common safety was a voluntary sacrifice, which will support a claim to contribution.

3. SEMBLE.

It would make no difference in such case that the danger was greatest to the property thus cast away.

4. SAME—SPARS BLOWN OVERBOARD.

A portion of a vessel's spars and sails was blown overboard by a gale and lay along-side the vessel, pounding against her side, but secured to her by the rigging. The gale continuing, the spars were cut adrift in order to prevent them from pounding a hole in the vessel's side. Held, that the cargo must contribute to the loss sustained by their sacrifice.

In Admiralty. Libel to enforce the payment of an adjustment of general average. The testimony disclosed the following facts:

On July 29, 1880, about noon, the bark Margarethe Blanca, on a voyage from Pillau to Philadelphia, laden with old rails and rags, encountered a squall, which carried away her head-gear, foretop-mast, and all above, with spars, rigging, and sails, and also her maintop-gallant-mast, and all above, with spars and rigging. This mass fell to leeward, and floated by the vessel's side, being secured by portions of the running and standing rigging. It appeared from the testimony that had the storm abated this material could have

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

been saved, and would have been valuable. The sea, however, was rough, and the spars began to pound against the vessel's side. The master and crew succeeded in getting out of the water and on deck the royal yard, together with one sail and the running gear, but the gale continuing, and there being danger of the remaining spars punching a hole in the vessel's side, the master, late in the afternoon, ordered the remainder of the floating material, etc., to be cut adrift, which was done. Subsequently the vessel encountered another gale, and was obliged to employ a steamer to tow her to port. Upon her arrival the loss was adjusted, and the adjusters included as part of the loss to be contributed for in general average the value of the spars, etc., cut adrift. Respondents, who were the owners of the cargo of rags, refused payment of their proportion of the value of this property, alleging that it was not the subject of general average, and should not have been included in the adjustment. This libel was then filed to enforce payment by them of their portion of the adjustment.

*Charles Gibbons, Jr.,* for libellant.

*Joseph Parrish, Edward Hopper,* and *Treadwell Cleveland,* for respondent.

BUTLER, D. J. No discussion of the law of jettison, generally, is necessary. "If goods are thrown overboard for the purpose of lightening the ship in time of common peril, the loss is to be made good by the contribution of all, because it was incurred for the benefit of all," is the language of the old Rhodian ordinance; and no subsequent statement has improved upon this concise definition of the general doctrine. From time to time its application has been extended,—so as to embrace goods destroyed or damaged in the act of casting away others, the furniture and other property of the ship, and the ship itself. No application of the doctrine has led to such earnest discussion, or such remarkable discordance, as that in favor of the ship and her property, and especially that description of property embraced in the general term "wreck."

The essential elements of a valid claim to general average are:—*First,* a common danger to ship and cargo—imminent, and apparently inevitable, except by the casting away of some part involved; *second,* a voluntary casting away of a part, to avoid the danger,—in other words a voluntary sacrifice of a part to save the remainder; *third,* the success of this effort.

That there was common danger in this case, is I think clear. It would make no difference that the danger was greatest to the property cast away, if it were so. But it was not. If the casting away had not occurred, it is more than probable that all would have gone down together. The attachments to the ship were such that the storm, act-

ing upon it and the suspended mass, would very soon have sent both to the bottom.

Was there voluntary sacrifice? What constitutes such sacrifice, in the sense involved, has been the subject of much discussion and disagreement, by text writers, and a good deal by courts. Where property has been displaced by storm, and itself becomes an especial source of danger, so that the master has, virtually, no option but to cast it away,—no choice between this and something else,—it has been strenuously urged by some authors and judges that there is no voluntary sacrifice in the act of parting with it; that the act is not voluntary because necessity requires it, and that it is not a sacrifice because the property, being so situated that it must necessarily be cast away, is already lost. When it is remembered, however, that this necessity arises alone from the continuance of the storm,—but for which the property would be as harmless, and as safe, as any other, and that in every case of lawful jettison, the property cast away is already doomed to certain loss, (as matters stand at the time,) the fallacy of this argument is apparent. From the earliest times a mast sprung or broken by storms, so as to become dangerous, or a part of the cargo displaced or from other cause rendered unsafe, and from necessity cast away for the common safety, has been the subject of general average. Wherever the circumstances are such as to afford reasonable chance of saving the property, but for the continued existence of the storm, the act of casting away must be regarded as a voluntary sacrifice. This I believe to be the true rule—having the support of all modern authorities: Lowndes, Law of Gen. Av. (2d Ed.) 24-32; 2 Phil. Ins. (4th Ed.) 1285; 1 Parsons, Mer. Law, 306; *Johnson* v. *Chapman*, 19 C. B. (N. S.) 58; *Barnard* v. *Adams*, 10 How. 303; *Star of Hope*, 9 Wall. 229. Arnold (Arn. Ins. 916, 2d Ed.) says: "If the will of man was in any way, even the least degree, contributory to the loss, that is all that is required [to make it a voluntary sacrifice.] It makes no difference that the pressure of circumstances was such as to prevent that will from being exerted except in one way." The same, says Mr. Lowndes, is the view of Bailey, whose theory of "moral certainty" amounts to this: that a ship, or other thing, is never to be considered lost until a loss has actually occurred. Some observations contained in *Johnson* v. *Chapman*, Mr. Lowndes thinks, indicate that Arnold has gone a little too far in the passage quoted. He says: "The cutting away of that which, being in a state in which

it cannot be saved, is already lost, is not, according to these observations, such a sacrifice as to give title to contribution." It may well be doubted, however, whether Arnold intended to include such an instance,—where the property is already lost, in effect, and the cutting away, as is said in *Johnson* v. *Chapman*, simply anticipates what must inevitably and directly occur. Mr. Lowndes remarks, however:

"Thus far we may safely conclude: before any loss which is directly occasioned by the hand or will of man, acting with a view to the common safety, can be excluded from the common average, on the ground that the danger to the property lost is so extreme as to preclude the notion of sacrifice, it must be shown that no rational hope of saving it remained,—that no change in the weather, however sudden, no one of those rapid vicissitudes which occur in navigation, could have saved, or enabled to be saved, the property thus given for all; showing, in short, that the thing was only nominally destroyed by the act of man, having virtually been lost before."

This, in my judgment, is an accurate statement of the law.

Thus the question, in all cases such as this, before the court, is one of fact, to-wit: Was there, at the time, reasonable chance of saving the property, but for the continuance of the storm? If there was, it was not lost; and the casting away of this chance, for the common safety, was a voluntary sacrifice, which will support a claim to contribution. Where the property is still on deck, though displaced and dangerous, there is no room whatever to doubt the right to contribution for jettison, in the present state of the law. Whether it is so on deck, or by the ship's side securely attached, when cast away, can make no difference. Such a distinction would be illogical—without the countenance of either reason or respectable authority. The true inquiry must be: Were the circumstances such as to afford reasonable chance of saving the property, at the time of jettison, no matter how situated, if the storm had then abated?

That the property here involved could have been saved if the storm had so abated, is not open to doubt. Indeed, that it could have been saved if the storm had abated some hours later, provided the ship had survived, I have little doubt. The attachments were such that it is not improbable they would have survived the storm, long as it continued, if the ship had remained afloat. But the danger to the ship and cargo, (arising from the continuance of the storm) demanded the sacrifice of this chance of saving the property. The statement of experts that they regard the property as lost before it was cast

away,—that it could not be saved, etc., amounts to nothing. It means simply that, under existing circumstances, (the continuance of the storm, and the danger to ship and cargo,) it could not be saved; in other words, that the emergency demanded its sacrifice, that in this sense it was doomed to destruction, and therefore lost. All admit that with an abatement of the storm, (in its situation when cast off,) it could have been saved. That it would have been valuable if saved is not questioned. The witnesses call it "wreck," but this is of no importance. In the loose, general sense of the term it was "wreck." No more so, however, than a confused and broken mass of displaced spars and sails on deck, would have been. In *Johnson* v. *Chapman, supra*, it is said that this term properly means, "that which has been rendered *useless* or *irrecoverable* by peril of the sea." This property was not rendered either useless or irrecoverable, except by continuance of the storm. That adjusters have denominated all such property "wreck," and consequently excluded it from their estimate of loss, regardless of distinguishing circumstances, is also unimportant. Such a practice may be convenient and avoid controversy, and these considerations doubtless have led to its adoption, where pursued. If the practice of adjusters, however, was less variable and inconsistent than it is, the result would be the same. The question is alone for the courts. There is no recognized general custom governing the subject.

The libel must, therefore, be allowed.